UNITED STATED DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA                    CRIMINAL NO. 12-CR-00146 (10)

 VERSUS
                                            JUDGE FOOTE

ALEXANDER DERRICK REECE - 01                MAGISTRATE JUDGE HANNA
DREW T. GREEN - 02
THOMAS WILLIAM MALONE, JR. - 03
BOYD ANTHONY BARROW - 04
JOSHUA ESPINOZA - 05
CURIOUS GOODS LLC - 06
RICHARD JOSEPH BUSWELL - 07
DANIEL JAMES STANFORD - 08
DANIEL PAUL FRANCIS - 09
BARRY L. DOMINGUE - 10

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SUPERCEDING
INDICTMENT
(Motion Number 1)

Defendant, BARRY L. DOMINGUE ("Domingue"), through undersigned counsel,

respectfully submits this memorandum in support of his Motion to Dismiss Superceding

Indictment (Motion Number 1).

I.      Introduction

By way of this motion, the Court is asked to decide whether the Superceding Indictment

should be dismissed because the original and superceding indictments are not premised upon any

valid or otherwise enforceable law. In deciding this motion, the Court will be asked to determine

whether it is permissible for the Drug Enforcement Administration ("DEA") to circumvent a

clear directive and mandate of Congress. Not only is the circumvention of Congress' will

impermissible in this case, it is also unlawful, illegal, and wholly unenforceable. Consequently,

{L0234171.1}

the law the government claims that defendant Domingue violated does not exist. Due to the DEA's failure to comply with the Congressional Review Act as discussed below, this prosecution is the kind of "foul blow," that the U.S. Supreme Court warned of in *Berger v. United States*, 295 U.S. 78 (1935).[1]

For a substance to become a controlled substance by administrative action of the DEA, under the mandates of the Congressional Review Act, the DEA must first inform Congress and the Comptroller General.  As will be discussed below, there is no evidence found to date establishing that the DEA complied with the will of Congress by providing the statutorily required notice to Congress and the Comptroller General that it was going to administratively temporarily list  certain synthetic cannabinoids under Schedule I of the Controlled Substances Act (herein referred to as the "CSA").  In fact, there is some evidence to at least suggest the DEA intended to bypass congressional review. In order for the DEA to legally list substances to be temporarily controlled under the CSA, Congress and the Comptroller General must be provided formal notice as further discussed below. Otherwise, DEA's listing of the substances does not carry the force of law. Because the law defendant is alleged to have violated does not exist, the charges against defendant must be dismissed.

---

[1] The *Berger* court stated "the United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor - indeed, he should do so. But, while he may strike hard blows, **he is not at liberty to strike foul ones**. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

## II.    Background

On November 24, 2010, the Drug Enforcement Administration (hereinafter "DEA"), issued a "Notice of Intent" (75 FR 71635) to temporarily schedule five specific synthetic cannabinoids (JWH-018, JWH-073, JWH-200, CP-47,497 and cannabicyclohexanol) as Schedule I controlled substances announcing and alleging that these substances constituted  an "imminent hazard" to the public if it did not proceed, according to 21 USC 811(h) of the Controlled Substances Act ("CSA").  In its "Notice of Intent," the DEA further publicly stated that in issuing the notice, it complied with various other federal statutes and regulations; and in a simultaneous press release the DEA announced it would be issuing a "Final Rule to Temporarily Control" after no fewer than thirty days thereafter.

Significantly, in its Notice of Intent, the DEA publicly proclaimed that its proposed "temporary" rule would not have significant financial impact upon small business entities, "will not result in an annual effect on the economy of $100,000,000 or more...", and that it complied with the Regulatory Flexibility Act (RFA) (5 U.S.C. 601, et seq.), the Congressional Review Act (CRA) (5 U.S.C. 801, et seq.) and Executive Orders 13132 and 12988; nevertheless ignoring Executive Order 12866.[2]

---

[2]    The representation of the DEA that its rule would not have an annual effect on the economy of $100,000,000.00 million or more appears to be incorrect based upon press releases issued by the DEA concerning raids and seizures conducted under its unlawful rule at issue herein.  Defendant reserves the right to contest the DEA's claim that the subject rule was not a "major rule" as defined by the CRA as it is doubtful that the DEA can substantiate its representation concerning the annual effect on the economy.

The DEA then issued a "Notice of Intent; correction," (76 FR 2287) dated January 7, 2011 and published January 13, 2011 claiming an "administrative error" and declared, without citing any legal authority whatsoever (and deviating from its historical actions discussed below), that it did not have to comply with either the CRA or RFA, thus "amending" the original November 24, 2010 Notice of Intent.[3]   On March 1, 2011, *ninety-seven (97)* days after publishing its original Notice of Intent[4] to address a so-called "imminent hazard," the DEA published its Final Order styled "Schedules of Controlled Substances: Temporary Placement of Five Synthetic Cannabinoids into Schedule I." (76 FR 11075).  However, in publishing its Final Order, the DEA appears to have consciously decided  not to comply with the CRA by failing to provide the statutorily required notice to Congress and the Comptroller General - a decision fatal to the so-called Final Order and to the attempt to prosecute Domingue.[5]  This matter is further constitutionally suspect due to the fact that the DEA promulgates, or in this case, attempted to promulgate, the very law that it seeks to enforce.  *Touby v. United States*, 500 U.S. 160, 168 (1991).

---

[3]   The "Notice of Intent; correction" was apparently issued by the DEA in response to a declaratory judgment/injunction action filed in the United States District Court, District of Minnesota, entitled "*L.P.O.E., Inc., et al v. The United States Drug Enforcement Administration, et al*" bearing docket number 10-cv-4944, seeking to have the district court declare the DEA's anticipated "temporary rule" to be unconstitutional and seeking to enjoin enforcement of the "temporary rule."  In that case, the plaintiffs challenged the DEA's assertion that its proposed "temporary" rule would  not have significant financial impact upon small business entities, would not result in an annual effect on the economy of $100,000.00 or more, and that the DEA had not complied with the Regulatory Flexibility Act (5 U.S.C. 601, et seq.) or the Congressional Review Act (5 U.S.C. 801, et seq.).  Rather than face the challenge on the merits, the DEA instead chose to take the position that it was not obliged to comply with the mandates of Congress. The *L.P.O.E.* case was ultimately dismissed on ripeness and jurisdictional issues.

[4]   In 2003, it took the United States military just three weeks to invade and conquer the country of Iraq.

[5]   This case evidences the classic idiom of the pot calling the kettle black.  Here, the DEA intentionally violated the specific mandates of Congress and is now attempting to use those violations to unlawfully accuse Domingue and others of committing crimes that do not exist.

On or about September 4, 2012, the government caused a grand jury to indict Domingue and others, alleging conspiracy and other unlawful activity based upon the government's claim that somehow the chemical AM-2201, a substance not listed in the aforesaid Notice of Intent, corrected Notice of Intent nor in the Final Order, was nonetheless made illegal by the Final Order and was a CSA Schedule I drug. The patented substance  known as AM-2201 was well known to the DEA as it was in existence long before the initiation of the DEA's actions to temporarily list the five aforementioned substances.[6] In the Superceding Indictment beginning at Count 1, the government alleges that AM-2201 is an analogue of JWH-018 and that the Analogue Act (21 U.S.C. 813) is alleged to be applicable to the DEA's temporary scheduling action.[7]  In any event, the legality of the government's claims in this matter are based upon the DEA's Final Order of March 1, 2011.

For the reasons that follow, the DEA's temporary scheduling order in this matter is invalid and in violation of the Congressional Review Act.  Because of this violation, the Final Order attempting to administratively add the five substances noted in the Superceding Indictment to the CSA is invalid and unenforceable.[8]  Thus, AM-2201 cannot be an analogue of a listed controlled substance, and the Superceding Indictment is invalid as a matter of law.

---

[6] Contrary to the allegations of the Superceding Indictment, AM-2201 is not a "designer drug;" however, this issue will be raised in future motions if it becomes necessary to do so.

[7] These and other issues will be addressed in separate motions, if necessary.  Suffice it to say, the chemical sought to be placed at issue in this prosecution was patented long before the DEA prepared its Final Order.  Had the DEA sought to schedule AM-2201 in its temporary scheduling action, it could easily have specifically named the chemical in its Notice of Intent, Notice of Intent; correction, Final Order and Final Order; extension rather than attempting to stretch the facts and the law by calling AM-2201 a "designer drug."

[8] The DEA also failed to comply with the Regulatory Flexibility Act (5 U.S.C. 601, et seq.) and Executive Order 12866.  Defendant reserves his right to contest those matters.

III.    **Argument and Law**

A.    **Congressional Review Act**

The Congressional Review Act (CRA; 5 U.S.C. §801-808) was enacted in 1996 to improve congressional authority and control over agency rule-making, and requires federal agencies to submit all of their final rules to both houses of Congress and the Comptroller General **before they can take effect**.

The CRA established expedited legislative procedures by which Congress may disapprove agencies' final rules by enacting a joint resolution of disapproval. Senator Don Nickles, one of the sponsors of the legislation, in a Joint Statement, noted:

> As more and more of Congress' legislative functions have been delegated to federal regulatory agencies, many have complained that Congress has effectively abdicated its constitutional role as the national legislature in allowing federal agencies so much latitude in implementing and interpreting congressional enactments. In many cases, this criticism is well founded. Our constitutional scheme creates a delicate balance between the appropriate roles of the Congress in enacting laws, and the Executive Branch in implementing those laws. This legislation will help to redress the balance, **reclaiming for Congress** some of its policymaking authority, without at the same time requiring Congress to become a super regulatory agency.[9]

Furthermore, Senator Nickles stated in his introductory statement to the Joint Statement:

> This joint statement is intended to provide guidance to the agencies, the courts, and other interested parties when interpreting the act's terms.

With only one exception, the CRA requires federal agencies to submit their covered final rules to both houses of Congress and the Comptroller General *before they can take effect*.

---

[9]  Joint statement of House and Senate Sponsors, 142 *Cong. Rec.* S3683 (daily ed. April 18, 1996), (Exhibit A).

Specifically, the first sentence of the CRA (Section 801 (a)(1)(A)) provides that:

> **Before a rule can take effect**, the Federal agency promulgating such rule **shall submit** to each House of the Congress and to the Comptroller General a report containing-(i) *a copy of the rule*; (ii) *a concise general statement relating to the rule, including whether it is a major rule*; and (iii) *the proposed effective date of the rule*.

Section 801(a)(4) provides:

> Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1)**.**

Section 801(a)(3) provides:

> A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—(A) the later of the date occurring 60 days after the date on which—(i) the Congress receives the report submitted under paragraph (1); or (ii) the rule is published in the Federal Register, if so published.

Thus, under the CRA, non-major rules may take effect upon submission to Congress and to the Comptroller General of the three minimal requirements of 5 USC 801(a)(1).  Major rules generally take effect 60 days after the proper report has been submitted to Congress and to the Comptroller General.

Rules that fall within the very narrow scope of Section 808, the "good cause" exception, take effect "at such time as the Federal agency promulgating the rule determines."  However, even rules falling under the limited 5 USC 808 exceptions must still be submitted to GAO and Congress "as soon as practicable after promulgation," and the congressional review period does not begin until they are submitted.[10]

---

[10]  Joint statement of House and Senate Sponsors, 142 *Cong. Rec.* S3683, at S3684 (daily ed. April 18, 1996) (Exhibit A).

Section 804(2)(A) generally defines a "major rule" as a rule that will have an annual effect on the economy of $100,000,000 or more.  Section 804(3) of the CRA defines a covered "rule" by referring to the definition in Section 551 of the Administrative Procedure Act (APA)[11], and when 5 U.S.C. 551(4) is read in conjunction with 5 U.S.C. 804(3), a "rule" is defined as follows:

> "rule" means the whole or a part of an agency statement of general ...applicability and future effect designed to implement, interpret, or *prescribe law* or policy...

In providing guidance on what rules are covered by the CRA, Senators Nickles and Reid in their Joint Statement (identified above) stated:

> The authors intend this chapter to be interpreted broadly with regard to the type and scope of rules that are subject to congressional review… The authors admonish the agencies that the APA's broad definition of "rule" was adopted by the authors of this legislation to discourage circumvention of the requirements of chapter 8.

Section 806 of the CRA acknowledges the possibility of judicial review and clarifies the applicability of the CRA where it unambiguously states:

> **(a)**   This chapter shall apply notwithstanding any other provision of law.

> **(b)**   If any provision of this chapter or the application of any provision of this chapter to any person or circumstance, *is held invalid*, the application of such provision to other persons or circumstances, and the remainder of this chapter, shall not be affected thereby.

The Final Rule at issue in this matter was allegedly promulgated by the DEA pursuant to the delegation of authority from the Attorney General pursuant to 21 U.S.C. 811(h) which

---

[11] 5 U.S.C. 551

provides, in part, the following:

(1) If the Attorney General finds that the scheduling of a substance in schedule I on a temporary basis is necessary to avoid an imminent hazard to the public safety, he may, by order and without regard to the requirements of subsection (b) of this section relating to the Secretary of Health and Human Services, schedule such substance in schedule I if the substance is not listed in any other schedule in section 812 of this title or if no exemption or approval is in effect for the substance under section 505 of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 355]. **Such an order may not be issued before the expiration of thirty days from**—

(A) the date of the **publication by the Attorney General of a notice in the Federal Register** of the intention to issue such order and the grounds upon which such order is to be issued, and

(B) the date the Attorney General has transmitted the notice required by paragraph (4)....

(4) The Attorney General shall transmit notice of an order proposed to be issued under paragraph (1) to the Secretary of Health and Human Services. In issuing an order under paragraph (1), the Attorney General shall take into consideration any comments submitted by the Secretary in response to a notice transmitted pursuant to this paragraph.

For unknown reasons, the DEA in issuing its Final Order of March 1, 2011, failed to comply with Section 801(a)(1)(A) of the CRA by not providing both Houses of Congress and the Comptroller General with the requisite "report" even though the proposed order under 21 USC 811 (h) required a public notice period of at least at least 30 days before the order would be eligible to become effective. During this minimum 30 day notice requirement under 21 USC 811 (h), the DEA further failed by attempting to invoke the "good faith" provisions of Section 808(2)

of the CRA.[12]   As a result of the failure of the DEA to follow the procedure under Section 801(a)(1)(A) in its attempt to temporarily place five synthetic cannabinoids into Schedule I of the Controlled Substances Act, the DEA's final order never became enforceable under the CSA.

The relevant action of the DEA with regard to its attempt to place five specific synthetic cannabinoids into the CSA can be summarized as follows:

1.     **November 24, 2010 -** the DEA publishes a "Notice of Intent" in the Federal Register to temporarily place five synthetic cannabinoids into Schedule I of the CSA. (75 FR 71635)[13]. In this notice, the DEA stated under the title "Congressional Review Act:"

> This rule is not a major rule as defined by 804 of the Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act). This rule will not result in an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of the United States-based companies to compete with foreign based companies in domestic and export markets.

---

[12] Even in a situation where Section 808 of the CRA is properly invoked (in this case it was not), the agency is still required to comply with Section 801 and provide Congress and the Comptroller General with the requisite "report." Joint statement of House and Senate Sponsors, 142 *Cong. Rec.* S3683, at S3684 (daily ed. April 18, 1996) (Exhibit A). The relevant section from the Joint Statement provides in part:  "Although rules described in section 808 shall take effect when the relevant Federal agency determines pursuant to other provisions of law, the federal agency still must submit such rules and the accompanying report to each House of Congress and to the Comptroller General as soon as practicable after promulgation. Thus, rules described in section 808 are subject to congressional review and the expedited procedures governing joint resolutions of disapproval. Moreover, the congressional review period will not begin to run until such rules and the accompanying reports are submitted to each House of Congress and the Comptroller General." In this case, the DEA deprived Congress and the Comptroller General of the requisite review by apparently not providing them with the requisite report during the time that the final order on synthetic cannabinoids was allegedly in effect.  The act of the DEA in apparently not complying with 801 was contrary to the will of Congress.

[13] See copy of the "Notice of Intent at Exhibit B.

2.    **January 13, 2011** - the DEA publishes a "Notice of Intent; Correction" (76 FR 2287)[14] wherein it stated:

> DEA also inadvertently included in its Notice of Intent a certification relating to the Congressional Review Act. The Congressional Review Act only applies to "final" rules. Accordingly, inclusion of the paragraph relating to the Congressional Review Act in the Notice of Intent was premature. Therefore, I hereby order that this paragraph (the fifth paragraph in the right column on page 71637 and continued on the top of page 71638), as well as the "Congressional Review Act" heading that precedes it, also be stricken.

3.    **March 1, 2011** - the DEA publishes its Final Rule (76 FR 11075)[15] and stated under the title "Congressional Review Act", in part:

> Pursuant to section 808(2) of the Congressional Review Act, the **agency is not required to comply with the Act**[16] if it makes a good faith finding that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest....This temporary scheduling action is taken pursuant to section 811(h), which is specifically designed to enable DEA to act in an expeditious manner to avoid an imminent hazard to the public safety from new or designer drugs or abuse of those drugs. Section 811(h) exempts the temporary scheduling order from standard notice and comment rulemaking procedures to ensure that the process moves swiftly. For the same reasons that underlie section 811(h), that is, DEA's need to move quickly to place these five cannabinoids into Schedule I because they pose a threat to public health, it would be contrary to the public interest to delay implementation of the temporary scheduling order by requiring DEA to undertake the procedures necessary to comply with the Congressional Review Act prior to the order taking effect.

---

[14] See copy of the "Notice of Intent; Correction" at Exhibit C.

[15] See copy of the "Final Rule" at Exhibit D.

[16] This statement is absolutely incorrect. Second 808 (2) does not exempt the DEA from complying with the CRA.

It is indeed curious as to what delay the DEA was envisioning as Section 811(h) of the CSA requires that notice be published at least thirty days before a final order may be issued. Further, in its original "Notice of Intent," the DEA declared that the Final Order would not be a "major rule" under Section 804 of the CRA and therefore, the order would have become effective upon submission of the requisite Section 801 report to Congress and the Comptroller General.  In other words, had the DEA complied with the CRA, there would have been no delay...the rule would have become effective as soon as the DEA provided Congress and the Comptroller General the 801 report, which as stated above is merely a copy of the proposed rule, a general statement relating to the rule, and the proposed effective date of the rule. In effect, the CRA simply requires that Congress and the Comptroller General be provided a copy of the proposed rule since the proposed rule is itself a "general statement relating to the rule."

Despite the merits or demerits of DEA's alleged "good faith" use of Section 808 of the CRA, the DEA is not entitled to avail itself of the "good cause" provision of Section 808(2) of the CRA because the DEA is bound by 811(h) of the CSA to provide at least a 30 day notice period, and obtain comment(s) from the Secretary of Health and Human Services before it could issue its final order. 21 USC 811(h)(1) and (4). In accordance with Section 808(2) of the CRA, the "good faith" exception may be invoked only when "an agency for good cause finds...that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." Here, the DEA could not comport its actions into 808(2) because it was not allowed to dispense with the minimum thirty day notice and public procedure requirement of 21 USC 811(h).  Further undermining DEA's "good faith" and "good cause" to avoid delay due to alleged "imminent hazard," ***ninety-seven (97) days*** elapsed from the time the DEA published its requisite

notice to the time that it published its final order in the Federal Register. The DEA apparently did

not deem promulgation of its final order to be so urgent that it couldn't take the time to send a

copy of its rule to Congress and the Comptroller General during the course of those 97 days.[17].

The more than three months delay in publishing its Final Order defeats the "imminent hazard"

claimed by the DEA to avoid compliance with Section 801 of the CRA. This is the type of

conduct warned about in the Congressional history of the CRA when Senators Nickles and Reid

wrote:

> Accordingly, all "rules" are covered under this chapter, whether issued
> at the agency's initiative or in response to a petition, unless they are
> expressly excluded by subsections 804(3)(A)-(C). The authors are
> concerned that some agencies have attempted to circumvent notice-
> and-comment requirements are trying to give legal effect to general
> statements of policy, "guidelines," and agency policy and procedure
> manuals. The authors admonish the agencies that the APA's broad
> definition of "rule" was adopted by the authors of this legislation to
> discourage circumvention of the requirements of chapter 8.

4.   **February 29, 2012** - the DEA published a Final Order, purporting to extend the

temporary scheduling of five specific synthetic cannabinoids for six months (77 FR 12201).[18] In

this extension order, the DEA states:

> Pursuant to the Small Business Regulatory Enforcement Fairness Act
> of 1996 (Congressional Review Act) (5 U.S.C. 801–808), DEA has
> submitted a copy of this Final Order to both Houses of Congress and
> to the Comptroller General."[19]

---

[17] That's 30 days longer than any of the more recent temporary scheduling actions (discussed below) prior to the scheduling of the cannabinoids....and in the prior actions, there was no attempt to assert the "good cause" 808 provision of the CRA.

[18] See copy of DEA's Extension of the Final Order at Exhibit E.

[19] See Exhibit E-1 for a copy of the extension order that appears on the DEA's website as of the date of this writing. A hyperlink to the same order appears on the DEA's homepage.

Although the DEA unilaterally determined that it was excused or exempted from complying with the CRA when it published its final order of March 1, 2011, for whatever reason, it decided that it was compelled to comply with the CRA when it published its extension order on February 29, 2012.[20] Thus, the DEA must have known that it was not entitled to avail itself of the so-called "good faith" exclusion of Section 808 of the CRA and also knew that it had failed to comply with the requirements of the CRA with regard to its final order on March 1, 2011. The laws of Congress are not mere window dressings that can be ignored at the whim of a federal agency. In less time than it took the DEA to issue its press release of March 1, 2011, it could have easily complied with Section 801 of the CRA and provided Congress and the Comptroller General with the requisite report. Regardless, as a result of its failure to comply with the CRA, the March 1, 2011 Final Order of the DEA has never taken effect, and it exists only as an illegal and invalid order, which cannot support a prosecution of the Superceding Indictment.

Notably, just seven months after it attempted to temporarily schedule the five specific synthetic cannabinoids identified in its invalid order of March 1, 2011, the DEA again sought to exercise the temporary scheduling authority of 811(h) concerning synthetic cathinones (e.g., bath salts). In that regard, the DEA published the requisite notice of intent (76 FR 55616) on September 8, 2011 and thereafter published its final order (76 FR 65371) on October 21, 2011. An extension of the Final Order (77 FR 64032) concerning the synthetic cathinone, methylone,

---

[20] The report on the extension order printed from the GAO website is attached as Exhibit F.

was published on October 18, 2012.[21]  In both its Final Order and in the extension, although the DEA once again violated federal law and failed to provide a statement as to whether the order was a "major rule" as required by Section 801 of the CRA, it at least *partially* complied with the CRA by sending a copy of the Final Order and extension to Congress and the Comptroller General.[22]

Also significant is the fact that although the DEA claimed that the temporary scheduling of the three synthetic cathinones was "necessary to avoid an imminent hazard to the public safety," it *did not attempt* to assert the "good cause" exception of Section 808 of the CRA as it had just a few months earlier with regard to synthetic cannabinoids. The DEA did not attempt to assert the "good cause" exception to the CRA reporting requirement even though it's notice stated that *deaths* had occurred from uses of synthetic cathinones. These steps taken by the DEA evidence its knowledge that Section 808 cannot be applied to the temporary scheduling of substances into Schedule I of the CSA because of the notice and other requirements of Section 811(h) of the CSA.[23]  Why would the CRA apply to the temporary scheduling of synthetic cathinones but not to the temporary scheduling of synthetic cannabinoids?  It's precisely the same action with precisely the same requirements.  The answer is simple...the Congressional

---

[21] The Notice of Intent, Final Order and Extension are attached for the Court's convenience as Exhibits G, H and I, respectively.

[22] The report on the Final Order and Extension is attached as Exhibit J.

[23] Interestingly, the notice of intent for the canthinones was published on September 8, 2011 and the final order was issued on October 21, 2011.  That's a lapse of only 43 days.  Notably, the DEA did not attempt to assert section 808. But yet, with regard to the temporary scheduling of synthetic cannabinoids, there was a 97 day lapse between the notice and final rule. The DEA's handling of the cannabinoids and the canthinones aren't consistent even though both allegedly presented and "imminent hazard" to the public. Strangely, the process used by the DEA to temporary list cannabinoids appears to be the only time that the DEA has attempted to claim  applicability of  the "good cause" provision of 5 USC 808(2).

mandate at Section 801 of the CRA applies to both.  Rather than comply with the CRA, the DEA

failed to comply with its obligations under the CRA, and  as a result, its final order of March 1,

2011 never became effective. The DEA cannot be allowed to pursue a prosecution where no

legal basis for the prosecution exists.[24]

The DEA knew of its obligation to comply with the CRA in utilizing, or in this case,

attempting to utilize, the temporary scheduling authority of Section 811(h) of the CSA. A review

of the history of the DEA's compliance with the CRA while also exercising the temporary

scheduling authority granted to the Attorney General under the CSA is revealing[25]:

1.  On **July 18, 2002**, the DEA published a "Notice of Intent" in the Federal
Register (67 FR 47341) to temporarily place Benzylpiperazine and
Trifluoromethyphenylpiperazine into Schedule I of the CSA.   In this
notice, the DEA states:

"*Small Business Regulatory Enforcement Fairness Act of 1996*
*[Congressional Review Act]*

This rule is not a major rule as defined by 804 of the Small
Business Regulatory Enforcement Fairness Act of 1996
[Congressional Review Act]. This rule will not result in an annual
effect on the economy of $100,000,000 or more; a major increase in
costs or prices; or significant adverse effects on competition,
employment, investment, productivity, innovation, or on the ability of
the United States-based companies to compete with foreign-based
companies in domestic and export markets."

2.  On **September 20, 2002** the DEA published a "Final Rule" in the
Federal Register (67 FR 59161) to temporarily place Benzylpiperazine

---

[24] In *Alameda County Medical Center v. Leavitt* ,559 F.Supp.2d 1,D.D.C.,2008., District Court Judge James
Robertson aptly described the issue: "**In this case, the Court is asked to decide whether a maneuver by the
Executive Branch deliberately designed to outfox a clear directive of Congress was successful. The answer is
no.**"

[25] Prior to 2002, the most recent time that the DEA attempted to exercise the temporary scheduling
authority under the CSA was prior to the enactment of the CRA in 1996.

and Trifluoromethyphenylpiperazine into Schedule I of the CSA.[26]   In
this rule, the DEA states:

"*Small Business Regulatory Enforcement Fairness Act of 1996
[Congressional Review Act]*

    This rule is not a major rule as defined by 804 of the Small
Business Regulatory Enforcement Fairness Act of 1996
[Congressional Review Act]. This rule will not result in an annual
effect on the economy of $100,000,000 or more; a major increase in
costs or prices; or significant adverse effects on competition,
employment, investment, productivity, innovation, or on the ability of
the United States-based companies to compete with foreign-based
companies in domestic and export markets."

For the temporary scheduling of Benzylpiperazine and Trifluoromethyphenylpiperazine,

**64 days lapsed** from the date that the notice of intent was published to the date of the final

order.  The dates are July 18, 2002 to September 20, 2002.

3.    On **July 18, 2002**, the DEA published a "Notice of Intent" in the
Federal Register (67 FR 47343) to temporarily place 2,5-Dimethoxy-
4-(n)-propylthiophenethylamine into Schedule I of the CSA.  In this
notice, the DEA states:

"*Small Business Regulatory Enforcement Fairness Act of 1996
[Congressional Review Act]*

    This rule is not a major rule as defined by 804 of the Small
Business Regulatory Enforcement Fairness Act of 1996
[Congressional Review Act]. This rule will not result in an annual
effect on the economy of $100,000,000 or more; a major increase in
costs or prices; or significant adverse effects on competition,
employment, investment, productivity, innovation, or on the ability of
the United States-based companies to compete with foreign-based
companies in domestic and export markets."

---

[26] The report on the rule was provided to Congress and the Comptroller General.  (Exhibit K ).

4. On **September 20, 2002** the DEA published a "Final Rule" in the Federal Register (67 FR 59161) to temporarily place 2,5-Dimethoxy-4-(n)-propylthiophenethylamine into Schedule I of the CSA.[27]   In this rule, the DEA states:

"*Small Business Regulatory Enforcement Fairness Act of 1996 [Congressional Review Act]*

This rule is not a major rule as defined by 804 of the Small Business Regulatory Enforcement Fairness Act of 1996 [Congressional Review Act]. This rule will not result in an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of the United States-based companies to compete with foreign-based companies in domestic and export markets."

For the temporary scheduling of 2,5-Dimethoxy-4-(n)-propylthiophenethylamine, **64 days lapsed** from the date that the notice of intent was published to the date of the final order. The dates are July 18, 2002 to September 20, 2002.

5. On **January 28, 2003**, the DEA published a "Notice of Intent" in the Federal Register (68 FR 4127) to temporarily place Alpha-methyltryptamine and 5-methoxy-N,N-diisopropyltryptamine into Schedule I of the CSA  In this notice, the DEA states:

"*Small Business Regulatory Enforcement Fairness Act of 1996 [Congressional Review Act]*

This rule is not a major rule as defined by 804 of the Small Business Regulatory Enforcement Fairness Act of 1996 [Congressional Review Act]. This rule will not result in an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of the United States-based companies to compete with foreign-based companies in domestic and export markets."

---

[27] The report on the rule was provided to Congress and the Comptroller General. (Exhibit L).

6.       On **April 4, 2003** the DEA published a "Final Rule" in the Federal Register (68 FR 16427) to temporarily place Alpha-methyltryptamine and 5-methoxy-N,N-diisopropyltryptamine into Schedule I of the CSA.[28]   In this rule, the DEA states:

"*Small Business Regulatory Enforcement Fairness Act of 1996 [Congressional Review Act]*

        This rule is not a major rule as defined by 804 of the Small Business Regulatory Enforcement Fairness Act of 1996 [Congressional Review Act]. This rule will not result in an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of the United States-based companies to compete with foreign-based companies in domestic and export markets."

For the temporary scheduling of Alpha-methyltryptamine and 5-methoxy-N,N-diisopropyltryptamine, **67 days lapsed** from the date that the notice of intent was published to the date of the final order.  The dates are January 28, 2003 to April 4, 2003.

More recently, the DEA has demonstrated that it is quite aware of its obligation to comply with the CRA, even when issuing rules of far less significance than the serious business at issue here of temporarily adding substances into Schedule I of the CSA and placing individuals in jeopardy for decades of imprisonment, thousands upon thousands of dollars in fines and legal fees, not to mention the severe mental and physical damage to the accused and their families.[29]  The following are illustrative:

---

[28] See Exhibit M, a copy of the report on the rule was provided to Congress and the Comptroller General.

[29] One need look no further than the recent tragedy involving the prosecution of Aaron Swartz in Massachusetts for an example of the extreme harm that can be visited upon an accused by federal criminal statutes and their enforcement.

1.   On **January 4, 2013** the DEA published a "Final Rule" in the Federal Register (78 FR 664) to Establish Drug Codes for 26 Substances.  In this rule, the DEA states that:

"*Congressional Review Act*

This rule is not a major rule as defined by the Congressional Review Act (5 U.S.C. 804).  This rule will not result in an annual effect on the economy of $100,000,000 or more, a major increase in costs or prices, or have significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of the United States-based companies to compete with foreign based companies in domestic and export markets.  **However, DEA has submitted a copy of this rule to both Houses of Congress and to the Comptroller General**."[30] (emphasis added).

2.   On **January 27, 2012** the DEA published a "Final Rule" in the Federal Register (77 FR 4228) styled "Technical Amendments and Corrections to DEA Regulations."[31]   In this rule, the DEA states that:

"*Congressional Review Act*

This rule is not a major rule as defined by Section 804 of the Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act). This rule will not result in an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of the United States-based companies to compete with foreign-based companies in domestic and export markets."

3.   On **June 29, 2010** the DEA published a "Final Rule" in the Federal Register (75 FR 37300) styled "Correction of Code of Federal Regulations: Removal of Temporary Listing of Benzylfentanyl and

_____

[30] A copy of the Final Rule is attached as Exhibit N; however, a copy of the rule allegedly sent to Congress and the Comptroller General could not be located on the website of the U. S. Government Accountability Office, presumably because the DEA did not do that which it claimed it did in the Final Rule. http://www.gao.gov/browse/date/week

[31] See Exhibit O.  A copy of the report provided to Congress and the Comptroller General.

Thenylfentanyl as Controlled Substances."[32]   In this rule, the DEA states that:

"*Congressional Review Act*

This rule is not a major rule as defined by Section 804 of the Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act). This rule will not result in an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of the United States-based companies to compete with foreign-based companies in domestic and export markets.

The requirements of the Congressional Review Act are quite clear and are easy to comply with.  For all rules, "the Federal agency promulgating such rule shall submit [a report] to each House of Congress and to the Comptroller General."  5 U.S.C. § 801(a)(1)(A).  Further, a major rule relating to such a report shall take effect on the latest of "the later of the date occurring 60 days after the date on which  (i) the Congress receives the report submitted under paragraph (1); or (ii) the rule is published in the Federal Register."  5 U.S.C. § 801(a)(3)(A).  The language is unequivocal.  The Final Rule published by the DEA on March 1, 2011 in this matter, could not take effect until both Houses of Congress and the Comptroller General received the report on the Final Rule.  That the DEA would seek to comply with the CRA in every other occasion, *except* when it sought to promulgate the Final Order at issue in this matter is quite incredible in light of the underlying prosecutions.  To this day, the DEA has failed to comply with the provisions of Section 801(a)(1)(A) and as a result, the DEA failed in its effort to temporarily place five specific synthetic cannabinoids into Schedule I of the Controlled Substances Act. The

---

[32] See Exhibit P.  A a copy of the rule provided to Congress and the Comptroller General.

Final Rule of March 1, 2011 exists only as an invalid and unenforceable rule.  As a result, the five synthetic cannabinoids were not temporarily placed into Schedule I, and indictments in this matter are not supported by any provision of law.

### B.    The DEA's Failure to Comply with the CRA is Subject to Judicial Review

In an attempt to avoid dismissal of the Superceding Indictment, the government will likely argue that Section 811(h) of the CSA and Section 805 of the CRA prevent judicial review.[33]  However, such position, if asserted,  has been rejected by the United States Supreme Court and for the following reasons, the actions, and inactions, of the DEA in this matter are subject to judicial review.

Section 811(h)(6) of the CSA provides:

"(6)    An order issued under paragraph (1) is not subject to review."

Section 805 of the CRA provides:

> No determination, finding, action, or omission under this chapter shall be subject to judicial review.

In *Touby v. United States*, 500 U.S. 160, 168 (1991), the Court, in addressing a constitutional challenge to Section 811(h) of the CSA, made it clear that persons facing prosecution arising from the temporary scheduling of a substance under Schedule I of the CSA have the right to judicial review of the DEA's actions.  The *Touby* Court noted:

> The United States contends, and we agree, that 201(h)(6) [21 USC 811(h)(6)] does not preclude an individual facing criminal charges from bringing a challenge to a temporary scheduling order as a defense to prosecution...This is

---

[33] Asking the court to support and enforce an illegal criminal sanction, while at the same time seeking to have its own conduct escape judicial review, would constitute the "foul blow" discussed in *Berger, supra*, and would undermine the rule of law and the good reputations of federal prosecutors and the DEA.

sufficient to permit a court to "'ascertain whether the will of Congress has been obeyed.

In a concurring opinion issued in *Touby*, Justice Marshall and Justice Blackmun aptly noted that:

> I join the Court's opinion but write separately to emphasize two points underlying my vote. The first is my conclusion that the opportunity of a defendant to challenge the substance of a temporary scheduling order in the course of a criminal prosecution is essential to the result in this case. Section 811(h)(6) of Title 21 U. S. C. expressly prohibits direct review of a temporary scheduling order in the Court of Appeals but says nothing about judicial review of such an order in other settings. *Under established rules of construction, we must presume from Congress' silence on the matter that it did not intend to foreclose review in the enforcement context.* See *Estep v. United States*, 327 U. S. 114, 120-122 (1946). See generally *McNary v. Haitian Refugee Center, Inc.*, 498 U. S. 479, 496 (1991); *Abbott Laboratories v. Gardner*, 387 U. S. 136, 140-141 (1967). An additional consideration reinforces this principle here. As the Court notes, *judicial review perfects a delegated-lawmaking scheme by assuring that the exercise of such power remains within statutory bounds.* See, e. g., *Skinner v. Mid-America Pipeline Co.*, 490 U. S. 212, 218-219 (1989). *Because of the severe impact of criminal laws on individual liberty, I believe that an opportunity to challenge a delegated lawmaker's compliance with congressional directives is a constitutional necessity when administrative standards are enforced by criminal law.* Cf. *United States v. Mendoza-Lopez*, 481 U. S. 828, 837-839 (1987); Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L. Rev. 1362, 1379-1383 (1953). *We must therefore read the Controlled Substances Act as preserving judicial review of a temporary scheduling order in the course of a criminal prosecution in order to save the Act's delegation of lawmaking power from unconstitutionality.* Cf. *Webster v. Doe*, 486 U. S. 592, 603-604 (1988). (Emphasis added).

Shortly after the CRA was enacted, the principal sponsors of the bill, Senator Don Nickles, Senator Harry Reid and Senator Ted Stevens, published a joint statement in the Congressional Record providing a detailed explanation of the CRA's provisions and its

legislative history.[34] Senator Nickles explained that, because the legislation did not go through

the committee process, virtually "no other expression of its legislative history exists." He went

on to say that "[t]his joint statement is intended to provide guidance to the agencies, **the courts**,

and other interested parties when interpreting the act's terms."[35]   Further, Section 806(b)

provides in part that "If  any provision of this chapter or the application of any provision of this

chapter to any person or circumstance, *is held invalid*...."  This section also contemplates some

measure of judicial review.

The Joint Explanatory Statement is clear as to the scope and limitation of the judicial

review provision.  It provides, in part:

> "***Limitation on judicial review of congressional or administrative actions***
> Section 805 provides that a court may not review any congressional or
> administrative "determination, finding, action, or omission under this
> chapter." Thus, the major rule determinations made by the Administrator of
> the Office of Information and Regulatory Affairs of the Office of
> Management and Budget are not subject to judicial review. Nor may a court
> review whether Congress complied with the congressional review procedures
> in this chapter. This latter limitation on the scope of judicial review
> was drafted in recognition of the constitutional right of each House of Congress to
> "determine the Rules of its Proceedings," U.S. Const., art. I, § 5, cl. 2, which
> includes being the final arbiter of compliance with such Rules.
> The limitation on a court's review of subsidiary determination or compliance
> with congressional procedures, however, *does not bar a court* from giving
> effect to a resolution of disapproval that was enacted into law. A court with
> proper jurisdiction may treat the congressional enactment of a joint resolution
> of disapproval as it would treat the enactment of any other federal law. Thus, a
> court with proper jurisdiction may review the resolution of disapproval and

---

[34]  It is settled that deference should be accorded to the legislative history and to the pronouncements by
sponsors of legislation.  See, e.g., *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 375 n.9 (2000)
(examining statements by sponsors of legislation); *Barnes ex rel. Estate of Barnes v. Koppers, Inc.*, 534 F.3d 357
(5th Cir. 2008); *Perrone v. General Motors Acceptance Corp.*, 232 F.3d 433 (5th Cir. 2000).

[35]   Joint statement of House and Senate Sponsors, 142 *Cong. Rec.* S3683, at S3683 (daily ed. April 18,
1996) (Exhibit A).

the law that authorized the disapproved rule to determine whether the issuing agency has the legal authority to issue a substantially different rule. The language of subsection 801(g) is also instructive. Subsection 801(g) prohibits a court or agency from inferring any intent of the Congress only when ''Congress does not enact a joint resolution of disapproval,'' or by implication, when it has not yet done so. In deciding cases or controversies properly before it, a court or agency must give effect to the intent of the Congress when such a resolution is enacted and becomes the law of the land. **The limitation on judicial review in no way prohibits a court from determining whether a rule is in effect. For example, the authors expect that a court might recognize that a rule has no legal effect due to the operation of subsections 801(a)(1)(A) or 801(a)(3).''**[36] (Emphasis added).

The undersigned was not able to locate a Fifth Circuit opinion addressing Section 805 of the CRA. There exist varying district court decisions and two cursory appeals court decisions concerning judicial review of the CRA.[37] Neither of the opinions of the appellate courts, which denied judicial review, addressed the unequivocal evidence of the contrary statements by the House and Senate sponsors of the CRA or the fact that such a reading of the Act, to preclude judicial review, would render it ineffectual and a useless waste of Congress' time and resources. In fact, it appears that the legislative history of the Act was not even briefed as an issue in those cases. Regardless, those cases are not controlling and certainly do not provide any guidance.

Further, those opinions exist in contradiction to the well-settled principles of statutory construction and are clearly in no way controlling. To hold that judicial review is prohibited would essentially make the CRA *meaningless and would evidence a grave departure from the legislative history of the act*. The statute would ascribe responsibilities without any remedy for

---

[36]   Joint statement of House and Senate Sponsors, 142 *Cong. Rec.* S3683, at S3686 (daily ed. April 18, 1996) (Exhibit A).

[37]   *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 386 U.S.App.D.C. 193) (2009); *Via Christie Regional Medical Center v. Leavitt*, 509 F. 3d 1259, 1271 n. 11 (10th Cir. 2007).

violations...an absurd result indeed.   A well-accepted canon of statutory construction requires a reviewing court to avoid any interpretation that would lead to absurd or unreasonable outcomes. *Carpenters District Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275 (5th Cir. 1994); *Birdwell v. Skeen*, 983 F.2d 1332, 1337 (5th Cir.1993); *Hughey v. JMS Development Corp.,* 78 F.3d 1523, 1529 (11th Cir. 1996) ("Courts will not foolishly bind themselves to the plain language of a statute where doing so would 'compel an odd result'"). Rendering the CRA unenforceable and meaningless would be the gold standard of absurdity.

The most well-reasoned opinion on this issue can be found in the case of *United States v. Southern Indiana Gas and Electric Co.* ,2002 WL 31427523 (S.D.Ind.), U.S. Dist. LEXIS 20936; 55 ERC (BNA) 1597 (S.D. Ind. 2002), and authored by the Honorable Judge Larry J. McKinney, Chief Judge.  The issue in that case was whether the EPA violated the Congressional Review Act, by establishing a new agency rule concerning the Clean Air Act without submitting a report to Congress about the rule as required by the Section 801 of the CRA.  In holding that judicial review is essential to the proper functioning of the CRA, the Court reasoned:

> "This Court respectfully disagrees with *Texas Savings* and *American Electric* and finds the language of the CRA judicial review provision to be ambiguous. As this Court reads 5 U.S.C. § 805, ("No determination, finding, action, or omission under this chapter shall be subject to judicial review"), it is susceptible to two plausible meanings: (1) as *Texas Savings* and *American Electric* concluded, Congress did not intend for courts to have any judicial review of an agency's compliance with the CRA; or (2) Congress only intended to preclude judicial review of Congress' own determinations, findings, actions, or omissions made under the CRA after a rule has been submitted to it for review. Under the first interpretation, which *Texas Savings* and *American Electric* adopted, ***agencies could evade the strictures of the CRA by simply not reporting new rules, and courts would be barred from reviewing their lack of compliance. This result would be at odds with the purpose of the CRA, which was to provide a check on administrative agencies' power to set policies and essentially legislate without***

*Congressional oversight. The CRA has no enforcement mechanism, and to read it to preclude a court from reviewing whether an agency rule is in effect that should have been reported would render the statute ineffectual.*

Moreover, the language of the statute precludes judicial review of a "determination, finding, action, or omission under this chapter ..." Agencies do not make findings and determinations under this chapter; Congress, on the other hand, is required to make a number of findings and determinations under the CRA. Therefore, it is logical to interpret the judicial preclusion language as barring review of the determinations, findings, actions, or omissions made by Congress after a rule is submitted by an agency, *but not extending the bar of judicial scrutiny to questions of whether or not an agency rule is in effect that should have been reported to Congress in the first place.*

Because there is a "genuine ambiguity in the statute," *Bd. of Trade of the City of Chi. v. Sec. and Exch. Comm'n,* 187 F.3d 713, 720 (7th Cir.1999), the Court will consider the legislative record.  The legislative history of the CRA confirms the limited reach of the preclusion of judicial review.

Thus, the legislative record buttresses the "limited scope" interpretation of the CRA's judicial review provision; the comments focus of the preclusion of review of determinations made by the OMB and Congress under the CRA, *not whether or not an agency's decision not to submit a rule in the first place is reviewable*. The sponsors of the CRA also explained, **"[t]he limitation on judicial review in no way prohibits a court from determining whether a rule is in effect."** No other mention of the judicial review provision is made in the legislative history...

If Congress wanted to bar judicial review of an agency's determination concerning the applicability of any of the provisions of the CRA, it would have clearly done so, as it had with the prior version of the RFA. Instead, Congress limited its judicial review preclusion by referring to determinations, findings, actions and omissions made under the CRA. Immediately preceding § 805, Congress enumerated a number of determinations, findings, and actions that the OMB and Congressional committees would be required to make under the CRA, and this Court concludes that Congress was referring back to those duties when it enacted the CRA's judicial review provision. *Thus, this Court concludes that it has jurisdiction to review whether an agency rule is in effect that should have been reported to Congress pursuant to the CRA."* (Emphasis added).

This matter evidences a situation where only the Courts are left to protect us from government action, albeit labeled "temporary," that will cause a lifetime of harm to the lives of numerous individuals, based upon the opinions and acts (whether devious or not) of a single or very few individuals.  As recognized in the landmark case of *Marbury v. Madison*, 5 U.S. 137 (1803) courts have the power to declare invalid acts of Congress and executive actions that run afoul of the Constitution.  "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury* at 163.  Judicial review serves to protect civil liberties and to protect us from the improper and/or illegal actions of the legislative and executive branches of government.  Neither the executive branch nor the legislative branch can "opt out" of  having its actions undergo the scrutiny of judicial review to ensure the protection of civil liberties.  The United States Supreme Court made it clear in *Touby* that persons facing prosecution arising from the temporary scheduling of a substance under Schedule I of the CSA, such as defendant herein, have the right to judicial review of the DEA's actions.  To deny such right would be an open affectation and countenance for the improper behavior of the DEA, lacking even the appearance of legitimacy.

## V. Conclusion

The DEA was obligated by the Congressional Review Act to submit its Final Order of March 1, 2011 to Congress and to the Comptroller General before the order could become effective.  The matter is simple: an agency rule is not effective until it has been sent to Congress and to the Comptroller General—that's what the statute says and that is what the legislative history reveals.  The DEA was well-aware of that rule of law; however, it essentially refused and

{L.0234171.1}

failed to submit the required report and therefore, the DEA's Final Order at issue in this matter never went into effect. In its desire to circumvent the CRA, the DEA after 97 days of its own internal delay attempted to improperly assert the "good cause" provision of the CRA. By virtue of the notice/public procedure requirement of Section 811(h) of the Controlled Substances Act, the "good cause" provision was not an available option to the DEA in attempting to promulgate its rule. Even if the "good cause" provision was an available option, the DEA would have still been required to submit the required report/order to Congress and to the Comptroller General. In an effort to avoid Congressional review through the invocation of an alleged imminent hazard, the DEA outfoxed itself. As a result, its Final Order never went into effect. The five specific substances named in the final order were never added to Schedule I of the Controlled Substances Act. The grand jury should never have been caused to issue indictments in this particular matter. Therefore, the indictments and all charges against defendant, Barry L. Domingue, should be dismissed immediately.

Respectfully submitted,

February 5, 2013

/s/ *Donald W. Washington*
Donald W. Washington (#21402) T.A.
JONES WALKER
600 Jefferson Street, Suite 1600
Lafayette, Louisiana 70501
Phone: (337) 593-7600
Fax: (337) 593-7601
Email: dwashington@joneswalker.com
Attorney for Barry L. Domingue

{L0234171.1}

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System, which will send notice of electronic filing to counsel of record, on this 5th day of February, 2013.

/s/ <i>Donald W. Washington</i>
Donald W. Washington (#21402)
