# UNITED STATED DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 12-CR-00146 (01)** |
| **VERSUS** | **JUDGE FOOTE** |
| **ALEXANDER DERRICK REECE - 01** | **MAGISTRATE JUDGE HANNA** |
| **DREW T. GREEN - 02** | |
| **THOMAS WILLIAM MALONE, JR. - 03** | |
| **BOYD ANTHONY BARROW - 04** | |
| **JOSHUA ESPINOZA - 05** | |
| **CURIOUS GOODS LLC - 06** | |
| **RICHARD JOSEPH BUSWELL - 07** | |
| **DANIEL JAMES STANFORD - 08** | |
| **DANIEL PAUL FRANCIS - 09** | |
| **BARRY L. DOMINGUE - 10** | |

## DEFENDANT REECE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COUNTS I AND III OF SUPERSEDING INDICTMENT

## I.  INRODUCTION

As set forth in the accompanying motion, the Defendant, Alexander D. Reece, requests that this Court enter an Order dismissing Counts I and III of the Superseding Indictment as to Mr. Reece. Given the complexity of the matters, disputed question of law, and the need to establish preliminary facts, the Defendant requests a hearing in this matter.[1]

---

[1] To determine whether the Analogue Act is void for vagueness as applied to a specific substance, district courts customarily have held hearings to decide the preliminary facts necessary to rule on the question of vagueness as a matter of law. *See, e.g., United States v. Roberts*, 363 F.3d 118 (2d Cir. 2004) (district court held hearing held on motion to dismiss controlled substance analogue charge on grounds of void for vagueness); *United States v. Klecker*, 348 F.3d 69 (4th Cir. 2003) (district court held hearing held on motion to dismiss controlled substance analogue charge on grounds of void for vagueness); *United States v. Orchard*, 332 F.3d 1133, 1136 (8th Cir. 2003) (district court held hearing held on motion to dismiss controlled substance analogue charge on grounds of void for vagueness); *United States v. Fisher*, 289 F.3d 1329, 1332 n. 5 (11th Cir. 2002) (district court held hearing held on motion to dismiss controlled substance analogue charge on grounds of void for vagueness); *United States v. McKinney*, 79 F.3d 105,107 (8th Cir. 1996) (district court held evidentiary hearing held on motion to dismiss controlled substance analogue charge on grounds of void for vagueness as applied); *United States v. Niemoeller*, IP0209CR1HF, 2003 WL 1563863 (S.D. Ind. Jan. 24, 2003) (evidentiary hearing held on Motion to Dismiss controlled substance analogue charge on grounds of void for vagueness as applied), *United States v. Forbes*, 806 F.Supp 232 (D. Colo. 1992) (evidentiary hearing held on motion to dismiss controlled

Counts I and III of the Superseding Indictment ("Indictment") charge that the Defendant, Alexander D. Reece, conspired with others to distribute four "controlled substance analogues" from March 1, 2011, to or about July 25, 2012.[2] According to the Indictment, these four chemicals (UR-144, AM 2201, JWH-081, and JWH-250) are unlawful "analogues" of a *temporarily* controlled substance, JWH-018, which itself was not a proscribed drug until March 1, 2011 when the Drug Enforcement Administration (DEA) used its "emergency authority" to "temporarily schedule" JWH-018 as a controlled substance.[3] To the extent a substance is "intended for human consumption," the Controlled Substance Analogue Enforcement Act, 21 U.S.C. §§ 802(32) and 813 ("Analogue Act"), makes it illegal to possess or sell a substance that is "substantially similar" in chemical structure and physiological effect to another substance that is listed in schedule I of the Controlled Substances Act ("CSA").

In its Order temporarily scheduling JWH-018, DEA did not mention analogues or the Analogue Act, nor did it state that its temporary prohibition against JWH-018 extended to controlled substance analogues. In short, DEA did not provide any public notice, let alone warning, that it considered the four charged chemicals to be unlawful. Indeed, when, at a significantly later point in time, DEA decided internally that these chemicals should be treated as analogues of JWH-018, it elected to withhold public notice of that fact. Nevertheless, the

---

substance analogue charge on grounds of void for vagueness as applied). Most recently, the district court in *United States v. Fedida*, which is cited to extensively herein, held an evidentiary hearing as part of its effort to rule on the defendant's motion to dismiss a controlled substance analogue charge on the grounds of avoid for vagueness. *United States v. Ilan Fedida*, Case no. 6:12-Cr-00209-RBD-DAB, Doc. 52 (M.D. Fla. 2012).

[2] Count I of the Superseding Indictment charges a conspiracy to distribute controlled substance analogues for the period of March 1, 2011 to July 25, 2012. Count III alleges a money laundering conspiracy existing from March 1, 2011 to May 1, 2012. Neither count alleges an overt act beyond May 1, 2011. The original Indictment, which was returned on May 18, 2012, alleged a conspiracy only existing from March 1, 2011 to on or about December 8, 2011.

[3] DEA proposed to permanently schedule JWH-018 on Schedule 1 on March 1, 2012. Schedules of Controlled Substances: Placement of Five Synthetic Cannabinoids Into Schedule I, 77 Fed. Reg. 12,508 (Mar. 1, 2012). At the same time it extended the temporary scheduling for another six months.

Superseding Indictment charges Mr. Reece with conspiring to sell chemicals that he was supposed to know were unlawful solely because they were allegedly "substantially similar" in chemical structure and physiological effect to another, temporarily scheduled chemical.

As to the four charged substances, the term "substantially similar," which defines unlawful "controlled substance analogues" under 21 U.S.C. § 801(32), is unconstitutionally vague because it fails to give fair notice that these four chemicals were proscribed by law. The Fifth Amendment's guarantee of due process requires that before anyone may be charged with a crime, he must be given "fair warning...of what the law intends to do if a certain line is passed" and that "[t]o make that warning fair...the line should be clear." *McBoyle v. United States*, 283 U.S. 25, 27 (1931). The right to receive fair warning includes prohibiting a "novel construction" of statutes and regulations that neither the statute's language nor any prior court decision has disclosed to be within its scope. *United States v. Lanier*, 520 U.S. 259, 266-67 (1997). Where statutory language is unduly vague in its application, individuals are left uncertain as to their legal obligations. Moreover, such statutes invite "a standardless sweep" that allow "policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen*, 415 U.S. 566, 575 (1974).

The unconstitutional vagueness of the Analogue Act as here applied to Alexander Reece is particularly evident because (1) there has never been a prosecution based on any of the four named chemicals, and (2) there has never been a prosecution under the Analogue Act based on any foundational controlled substance that was only temporarily scheduled by DEA (as was JWH-018 on March 1, 2011). As discussed below, this Indictment and case stand in stark contrast to prior prosecutions of analogues, such as GBL and MDMA, where there was clear notice and warning of their illegality based on statutory language, legislative history, or judge-

made law. None of these forms of notice existed in the present circumstances.

The Analogue Act's legislative history is very clear. It shows that Congress enacted this law to combat "designer drugs," or newly created substances synthesized by underground chemists with the specific aim of keeping one step ahead of the Controlled Substances Act's drug scheduling process. In passing the Analogue Act, Congress's "declared purpose" was to attack "underground chemists who tinker with the molecules of controlled substances to create new drugs that are not yet illegal." *United States v. Forbes*, 806 F.Supp. 232, 238 (D. Colo. 1992) (analyzing legislative history). In the case of designer drugs—the problem that the Analogue Act was intended to remedy—individuals who deal in them must surely know that they are analogues because these chemicals were specifically synthesized to mimic the effects of controlled substances.

However, the four chemicals charged in the Indictment are not designer drugs and were certainly not created to mimic the effects of JWH-018. The four chemicals were well known and available for many years before DEA promulgated its March 1, 2011 Order. There is nothing about these chemicals that would put a reasonably intelligent layman on notice of their supposed analogue status. The four charged substances are all research chemicals created years ago by academic and industrial scientists. These chemicals were not created with the purpose or intention of circumventing the CSA; rather, some of these chemicals were synthesized for academic research, while others were created for treatment of Parkinson's disease, glaucoma, or general pain relief. It is manifestly unfair to expect a layperson to know, absent amplifying guidance from the regulatory agency, that the Analogue Act applied to these research chemicals.

As will be shown by our experts, and acknowledged by the Government's experts as well, the scientific community has not reached any consensus as to the meaning of the key term

"substantially similar" as used in the Analogue Act. Indeed, "substantially similar" is not a scientific term. There is no scientific protocol for measuring or testing substances to ascertain their "substantial similarity" in chemical structure or pharmacological effect. Accordingly there is no general agreement among chemists that the "chemical structure" of the controlled substance JWH-018 is "substantially similar" to the structures of the four charged chemicals. Moreover, and as will be shown below, it was impossible prior to the dates charged in this Indictment to know whether any of these chemicals were analogues of JWH-018 from the standpoint of its physiological effects on the human central nervous system. Simply put, no pharmacologist or scientist had before then-or even yet-performed the studies or trials necessary to measure and compare the physiological effects of these chemicals.

Illustrating the complete lack of any notice of illegality, the body of this memorandum highlights various statements by members of Congress and federal officials who, during the times relevant to this Indictment, expressed their belief that these chemicals were not prohibited by law. Indeed, federal law enforcement officials acknowledged the widespread public belief that synthetic cannabinoids (as the charged substances have been classified) were lawful to sell and use as of June 2012. At that point in June, 2012, officials issued warnings to merchants advising them that certain substances were against the law, even though they were not specifically listed in any schedule of controlled substances. Mr. Reece, however, received no such warnings during the timeframe of the alleged conspiracy. Instead, he was charged with three felonies, despite having already withdrawn from the business of buying and selling the chemicals at issue on his own accord.

This prosecution is fatally defective for another, separate reason. The defect arises from its novel combination of the Analogue Act with the Attorney General's temporary scheduling

5

authority. This Indictment seeks to criminalize four previously lawful substances based on their alleged "substantial similarity" to another chemical that had never gone through the normal science-based, notice-and-comment rule making process prescribed by law. Instead, JWH-018 was "temporarily placed" in schedule 1 of the CSA through "emergency" DEA action that eliminated all otherwise required scientific considerations and procedural protections. As will be discussed further below, the Analogue Act and the temporary scheduling process are mismatched; the former is based on a substance's chemical structure and physiological effect on the central nervous system, while the latter is accomplished by DEA action with no consideration of chemistry, physiology, or any science whatsoever.

Moreover, when Congress delegated legislative authority to the Attorney General, who sub-delegated it to DEA, Congress circumscribed its delegation with the "intelligible principle" that DEA could act only to confront public health emergencies caused by widespread and uncontrolled abuse of designer drugs. In this case, and as will be set forth in detail herein, by combining the Analogue Act with temporary scheduling, the DEA criminalized four substances that, in actuality, presented absolutely no imminent threat to the public health. By so doing, the Attorney General extended his delegated power beyond the will of Congress and disregarded the "intelligible principle" that is supposed to guide such delegated authority.

## II. DISCUSSION

### A. FACTS

On or about September 4, 2012, a Superseding Indictment was returned against Alexander Reece and others based on allegations that he sold quantities of four named chemicals alleged to be "controlled substance analogues...knowing that the substance was intended for

human consumption." Doc. 57, Ct. I, ¶ II. The Indictment identifies these substances as AM-2201, JWH-081, JWH-250, and UR-144, and labels them as "synthetic cannabinoids." Although the Indictment does not explicitly identify the controlled substance to which the four chemicals are alleged to be analogues, it appears to be JWH-018—the only controlled substance referenced in the Indictment. Doc. 57, Ct. 1, ¶ 1 C.

On March 1, 2011, DEA issued a final emergency order temporarily placing JWH-018 in schedule I of the CSA. Schedules of Controlled Substances: Temporary Placement of Five Synthetic Cannabinoids Into Schedule I, 76 Fed. Reg. 11,075 (Mar. 1, 2011) ("DEA Order"). In temporarily scheduling JWH-018, the DEA did not have to follow the statutory requirements of notice-and-comment rulemaking and oral hearings that are ordinarily required for scheduling controlled substances, nor did DEA make the series of other findings required by 21 U.S.C. § 811(a)-(b). *See* 21 U.S.C. § 811(h) (providing for temporary scheduling of substances under the CSA).

As a promulgated regulation, the DEA Order was subject to Section 3 of Executive Order 12988, Civil Justice Reform. Executive Order 12988, Civil Justice Reform, 61 Fed. Reg. 4, 729 (Feb.7, 1996) (citing 61 C.F.R. § 26 (1996)). Section 3(b)(2) of the Executive Order requires DEA to specify "in clear language the effect on existing federal law or regulation, if any, including all provisions repealed, circumscribed, displaced, impaired, or modified." Though it was undoubtedly aware of the four chemicals at issue in the instant Indictment, DEA did not include them or reference them in its Order. Moreover, the DEA Order did not mention any "analogues" of this, or any other temporarily banned substance referenced in the Order, nor did it mention 21 U.S.C. § 813, or state that § 813 applied to analogues of JWH-018.

In the aftermath of its Order, the DEA took no action against the four chemicals named in the Indictment until Congress itself placed three of them (AM-2201, JWH-081, and JWH-250) on schedule I when it enacted the Food and Drug Administration Safety and Innovation Act ("FDASIA"), Public Law 112-144, effective  July 9, 2012.[4]

Count I of the Indictment charges that Mr. Reece conspired with others to possess and distribute these four alleged "controlled substance analogues" in violation of 21 U.S.C. §§ 846, 841, and 813. Specifically, the Indictment alleges that from March 1, 2011, to on or about May 1, 2012, Mr. Reece "supplied" these four chemicals through two businesses to "NutraGenomics and other businesses and individuals throughout the United States." Indictment, Ct I, ¶ I G. Count III alleges that in violation of 18 U.S.C. § 1956(h), Mr. Reece and others engaged in a money laundering conspiracy by conducting "financial transactions" with proceeds received from allegedly distributing the four chemicals in order to "promote the specified unlawful activity...charged in Count 1."

During the period in which the Indictment alleges that Mr. Reece distributed the four chemicals, federal law had not identified or listed any of them as controlled substances on the schedules of the Controlled Substances Act, 21 U.S.C. § 812, nor did DEA list any of the four

---

[4] The lack of fair warning and notice at issue in this motion only concerns the period between March 1, 2011 and July 9, 2012, during which time JWH-018 was temporarily scheduled pursuant to the emergency ban. On July 9, 2012, the pertinent portion of FDASIA became effective, clearly outlawing three of the charged chemicals. It is significant that the new statute abandons the unworkable "substantially similar" approach taken by the Analogue Act (and in this Indictment) in favor of a completely different formulation that is generally accepted by the scientific community. *See* Ex. 1, Aff. of Joseph P. Bono, at ¶ 13-16. Some members of Congress opposed the new legislation, preferring to allow the normal statutory drug scheduling process to proceed, rather than for Congress to schedule new substances legislatively. Congressman Scott of Virginia observed that the bill "circumvents the normal process,...skirts scheduling substances, and does so without any scientific or medical research or evidence to support it." 157 Cong. Rec. H8239 (Dec. 7, 2011) (statement of Rep. Scott).

chemicals on its web site, "Drugs and Chemicals of Concern."[5] Only recently, after the return of the Superseding Indictment in this case, did the DEA list UR-144 on its website as a "chemical of concern."[6]

Recent testimony by DEA agents and chemists reflects that DEA decided to classify two of the chemicals as analogues months after March 1, 2011, the date on which it issued its order temporarily scheduling JWH-018 under the CSA. In testimony before this Court, DEA Supervisor and Lead Case Agent Donald DeSalvo acknowledged that he did not know that AM-2201 was supposedly an analogue until the "fall of 2011."[7] DEA Chemist Dr. Terrence Boos testified in U.S. District Court in the Middle District of Florida that his agency did not make the determination that UR-144 was an analogue until "early 2012."[8] According to Dr. Boos, DEA only "recently placed" UR-144 on its website for drugs and chemicals of concern.[9]

Nonetheless, according to the Indictment and § 813, "to the extent intended for human consumption," the four chemicals are treated the same "for the purposes of any Federal law" as a schedule 1 controlled substance because they are alleged to be "controlled substance analogues." 21 U.S.C. § 802(32) defines a "controlled substance analogue" as a substance:

---

[5] *See* DEA, Drugs and Chemicals of Concern, July 25, 2011, http://web.archive.org/web/20110725180218/http://www.deadiversion.usdoj.gov/drugs_concern/index.html (listing none of the four charged chemicals).

[6] The DEA listed UR-144 as a "chemical of concern" after November 8, 2012. *Compare* DEA, Drugs and Chemicals of Concern, Nov. 8, 2012, http://web-beta.archive.org/web/20121108205301/http://www.deadiversion.usdoj.gov/drugs_concern/index.html *with* DEA, Drugs and Chemicals of Concern, http://www.deadiversion.usdoj.gov/drugs_concern/index.html (last visited Mar. 8, 2013) (containing DEA's most recent list of Drugs and Chemicals of Concern).

[7] *United States v. Buswell*, Case No. 6:11-00198, Transcript of *Garcia* Hearing, P. 64-65 (W.D. La. May 14, 2012) (attached hereto as Ex. 2).

[8] Working with "other scientists" and "pharmacologists" at DEA, Dr. Boos first opined that UR-144 was an analogue of JWH-018 in early 2012 and wrote a DEA monograph reflecting his opinion in April 2012. *United States v. Fedida*, Case No. 6:12-cr-00209-37DAB, Doc. 52, Testimony of Dr. Terrence Boos, P. 255 (M.D. Fla. Dec. 6, 212) (attached hereto as Ex. 3).

[9] *Id*. at 256.

(i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; [and][10]

(ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

(iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

(B) . . . . .

(C) Such term does not include--

(i) a controlled substance;

(ii) any substance for which there is an approved new drug application.

### B.  DUE PROCESS VIOLATION: THE ANALOGUE ACT DOES NOT PROVIDE FAIR WARNING THAT THE FOUR CHEMICALS ARE ILLEGAL ANALOGUES OF JWH-018

To comply with the Due Process Clause of the Fifth Amendment, the Analogue Act, when applied to the four chemicals here, must provide "fair warning...in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle*, 283 U. S. at 27 ("[A] a statute which...forbid[s]...the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process."); *Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1365 (10th Cir. 1981). In deciding whether this prosecution based on the Analogue Act can go forward *in the circumstances here*, the Court must first determine whether the Analogue Act provides notice sufficient to alert "ordinary people [to] what conduct is prohibited."

---

[10] Courts interpret the elements of § 802(32) conjunctively. To qualify as a controlled substance analog, the substance must satisfy clause (i) and either clause (ii) or (iii). *United States v. Turcotte*, 405 F.3d 515, 52 (7th Cir. 2005) (collecting cases embracing the conjunctive view).

*Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *Lanzetta v. New Jersey*, 306 U. S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids.") Second, the Court must evaluate whether the Analogue Act *when applied to the four chemicals here* "fails to provide sufficiently explicit standards for those who apply it when it 'impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis.'" *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

One "manifestation of the fair warning" requirement is that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266-67 (1997); *see, e.g., Bouie v. City of Columbia*, 378 U.S. 347 (1964) (by giving retroactive application to its new construction of criminal trespass statute, the court deprived petitioners of their right to fair warning of a criminal prohibition and violated due process clause). Another closely related "manifestation" of the fair warning requirement is the canon of strict construction of criminal statues, a concept which requires that criminal statutes be applied only to "conduct clearly covered," and any ambiguities must be resolved in favor of the defendant. *Lanier*, 520 U.S. at 266-67; *see, e.g., Dowling v. United States*, 473 U.S. 207 (1985) (In assessing the reach of a federal criminal statute, courts must pay close heed to language, legislative history, and purpose in order to strictly determine the scope of the conduct the enactment forbids and typically find a "narrow interpretation" to be the appropriate one.) As discussed below, prosecuting Mr. Reece for alleged analogues of a "temporarily" scheduled controlled substance

is a "novel construction" of the Analogue Act that no statute or any prior judicial decision has disclosed to be within its scope.

### C. "SUBSTANTIALLY SIMILAR" IS A FATALLY DEFECTIVE STANDARD THAT HAS NO SCIENTIFICALLY ACCEPTED MEANING AND CANNOT BE DETERMINED BY ANY GENERALLY ACCEPTED TEST OR MEASUREMENT

Of particular significance to whether the Analogue Act in this case gave fair notice of what conduct was criminalized is the total lack of clarity surrounding its key definitional term. The term "substantially similar" as used in the definition of a "controlled substance analogue" in 21 U.S.C. § 802(32)(A) is vague as applied to the four chemicals alleged in the Indictment because it is insufficiently clear to inform "ordinary people" of its meaning. Not only laymen, but also qualified expert chemists, find the term unworkable and impossible to apply. "Substantially similar" is simply not a meaningful term in the science of chemistry; rather it is the product of legislative creation. *See* Ex. 1, Aff. of Joseph P. Bono, at ¶ 6-8; Ex. 4, Aff. of Dr. James McCarthy, at ¶ 5-6. Moreover, scientists have never agreed on any standardized test for determining whether two substances are "substantially similar" in molecular structure. *Id.*

The Analogue Act itself is devoid of any prescribed standard for evaluating or determining substantial similarity between a controlled substance on one hand, and a different chemical alleged to be its analogue, on the other. *See* Ex. 1, Aff. of Bono, at ¶ 15. Moreover, the Analogue Act does not authorize the Attorney General, or any other regulatory authority, to promulgate a standard by which the "substantial similarity" of substances can be measured. *See id.* Consequently, in a case of first instance involving substances such as those in the present Indictment, any claim that such substances are analogues is necessarily based on an exercise of conjecture and prosecutorial discretion of unusual breadth. Ultimately, it has been left to courts and juries to determine substantial similarity on a case-by-case basis. *United States v. Roberts,*

363 F.3d 118, 124 (2d Cir. 2004) (in the absence of prior court decisions on the substances charged, neither the statute nor any regulation provides real notice of their illegality and the Analogue Act leaves decision up to the courts).

Under the circumstances presented here, whether the four charged chemicals are in fact controlled substance analogues is not something Mr. Reece could have known. Indeed, whether any of the charged chemicals are in fact analogues will not be conclusively known until a verdict is rendered by a jury, should that eventuality ever occur. The unlawfulness of the substances Mr. Reece is alleged to have distributed had not even been hinted at in the DEA Order issued on March 1, 2011, or otherwise publically noticed by the DEA. Consequently, by bringing this Indictment, the Attorney General has forced Mr. Reece to assume the risk of how a jury might apply the "substantially similar" standard to substances never before subjected to legislative, regulatory or judicial scrutiny. The Second Circuit questioned whether this state of affairs might, under appropriate circumstances, raise fundamental fairness problems: "It is an interesting question under what circumstances a statute that depends on the resolution of a factual question about which reasonable juries can disagree is specific enough to withstand a vagueness challenge." *United States v. Ansaldi*, 372 F.3d 118, 123 (2d Cir. 2004).[11]

As the *Forbes* court instructed, determining what is substantially similar, both chemically and pharmacologically, "incorporates a scientific term of art and requires reference to the appropriate fields of chemistry and pharmacology to determine its meaning." *Forbes*, 806 F.Supp. at 237. However, as the Defendant's chemical and pharmacological experts explain in

---

[11] The *Ansaldi* court found that it did not have to decide that issue because the charged substance, GBL, was "one of the substances that the statute actually identifies as a potential controlled substance analogue." *Ansaldi*, 372 F.3d at 123. The court observed that, "in passing the Date-Rape Drug Act, Congress specifically found that GBL presented a significant law enforcement problem." *Id.* "[T]hat fact—independent of the jury's confirmation—is clear enough to have put an ordinary person on notice of the illegality of the sale of GBL for human consumption." *Id.*

the attached affidavits, the term "substantially similar" has no recognized scientific definition in either chemistry or pharmacology. *See* Ex. 1, Aff. of Bono, at ¶ 6-8; Ex. 4, Aff. of Dr. McCarthy, at ¶ 5-6; Ex. 5, Aff. of Dr. Terrence Kenakin, at ¶ 5. As a scientific matter, there is no consensus as to what degree of structural difference between JWH-018 and these four charged chemicals will suffice to defeat the conclusion that they are "substantially similar." *See* Ex. 1, Aff. of Bono, at ¶ 6-8; Ex. 4, Aff. of Dr. McCarthy, at ¶ 5-6. For example, Joseph Bono, a former lead chemist for the DEA, has observed that "substantially similar" has no consensus definition with acceptance in the scientific community because the term is referenced as a legal concept rather than as a scientific concept:

> In practice, chemists do not employ the term "substantially similar" in comparing the chemical structures of different substances. There is no consensus or agreed upon scientific standard for determining whether one substance is "substantially similar" to another. I am not aware of any peer-reviewed scientific literature addressing the meaning of "substantially similar" or setting forth a methodology for measuring whether that standard has been met.

Ex. 1, Aff. of Bono, at ¶ 6-8.

In fact, the Government's designated chemistry expert in this case, Dr. Terrance Boos, himself recently acknowledged that the scientific community disagrees as to the meaning of "substantially similar." Testifying on behalf of the government in the Middle District of Florida on the subject of whether UR-144 and XLR-11 and are "substantially similar" to JWH-018, Dr. Boos stated in response to direct questions by the Court:

> The Court:   Listen to me. The question is, do you agree or do you not agree as to whether or not there is a consensus within the scientific community that the methodology that you utilized to determine whether or not these compounds are substantially similar within the definition of the Act exists? Is there consensus or is there not?
>
> Dr. Boos:   I think today has demonstrated that this is not.
>
> The Court:   Thank you.

> Mr. Felman:   Q.  Do you know whether or not your methodology of concluding that these things are substantially similar in chemical structure has been subjected to any sort or peer review or publication? Have you published your methodology?
>
> Dr. Boos:      A.  We have not.

*United States v. Fedida*, Case No. 6:12-cr-00209-37DAB, Doc. 52, Testimony of Dr. Terrence Boos, P. 251 (M.D. Fla. Dec. 6, 2012) (attached hereto as Ex. 3).

Wrestling with the same issue, the Second Circuit in *Roberts* observed that, "it might well be that a one (or two) atom difference in a molecule made such a radical difference in a substance's relevant characteristics that any similarity in two-dimensional charts would not be 'substantial' enough to satisfy the definition of 'controlled substance analogue.'" *Roberts*, 363 F.3d at 124; *see also Forbes*, 806 F. Supp. at 237 ("The scientific community cannot even agree on a methodology to use to determine structural similarity.") One commentator aptly described the use of the term "substantially similar" in the Analogue Act as "[t]he unholy union of legalese and chemistry jargon…probably enough to bewilder even the most studious individuals." G. Kau, *Flashback to the Federal Analogue Act of 1986: Mixing Rules and Standards in the Cauldron*, 156 U. Pa. L. Rev. 1077, 1100 (2008).

The problem is even more pronounced in connection with the second Analogue Act requirement: that the controlled substance and the four charged chemicals have "substantially similar" or greater *pharmacological effects* on the human central nervous system. 21 U.S.C. § 802(32)(A). For example, two molecules may be very close in their chemical structures but may nevertheless differ greatly in their pharmacological effects on the body. Ex. 5, Aff. of Dr. Kenakin, at ¶ 5; *See, e.g.*, *United States v. Washam*, 312 F.3d 926, 932 (8th Cir. 2003) ("While

MSG might be substantially similar in physical and chemical structure to GHB, … MSG does not have similar effects on the human body.").

In this case, the requirement that the four chemicals have a "stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system" caused by JWH-018 presents issues making a conclusive finding impossible. First, although JWH-018 was temporarily scheduled on March 1, 2011, the DEA's Order failed to classify JWH-018 as a "stimulant, depressant, or hallucinogenic" in contrast to all other scheduled substances, which are classified into one of these three categories.[12] *See* 21 U.S.C. § 812; 21 C.F.R. § 1308.11-1308.15 (providing the schedules of controlled substances and identifying whether each as either a stimulant, depressant, or hallucinogenic). Second, and more important, prior to the dates alleged in the Indictment there was simply no human study data to support a pharmacological comparison of JWH-018 and the four chemicals; the necessary studies simply had not been done. *See* Ex. 5, Aff. of Dr. Kenakin, at ¶ 7; Ex. 6, Aff. of Dr. Buffington, at ¶ 9. For example, recent testimony by DEA neuropharmacologist Dr. Sandy Ghozland, a specialist in cannabinoids, starkly illustrates that DEA still does not know the pharmacological effects of UR-144, one of the four chemicals charged in the instance case. Dr. Ghozland testified that DEA lacked the pharmacological data on UR-144 to determine if it had the same effect as JWH-018:

> AUSA Muench:     Do you have an opinion with regards to whether UR-144 has an effect on the central nervous system that is

---

[12] Indeed, neither the Attorney General nor the DEA considered scientific evidence of the pharmacological effect of JWH-018 because, as discussed above, temporary scheduling of JWH-018 simply did not require such consideration. 21 U.S.C. § 811(h). With no official consideration given to the "stimulant, depressant, or hallucinogenic effects" of JWH-018, until its final scheduling in July 2012, it was unreasonable to expect a layman of ordinary intelligence—or even an expert—to know that the four substances charged in this case had effects on the central nervous system "substantially similar" to the effects of JWH-018.

|                | substantially similar to the effect on the central nervous system as JWH-018? |
|----------------|-------------------------------------------------------------------------------|
| Dr. Ghozland:  | I anticipate it will. I do not have any data, hard data, confirming its pharmacological effect as of now; but based on its binding to the CB-1 reception and based on its pattern of seizures, I anticipate that it does have similar pharmacological effects as JWH-018. |
| Mr. Meunch:    | Q. Now, you say you anticipate. Is there anything that you expect in the future will help you formulate a more concrete opinion rather than just anticipating that it will have a similar or greater effect on the central nervous system as JWH-018? |
| Dr. Ghozland:  | Yes. DEA has requested that the National Institute of Drug Abuse . . . contract out studies to examine the pharmacology in vivo and in vitro of UR-144 as it has for JWH-18 for the purpose of the Federal Register of last year. |
| *              | *                                       * |
| The Court:     | Mr. Meunch, what does something that's going to happen in the future have to do with whether or not this witness has an appropriate opinion with respect to the pharmacological effect of this drug as we sit here today? |

*Fedida*, Case No. 6:12-cr-00209-37DAB, Doc. 52, Testimony of Dr. Sandy Ghozland, P. 290-92

(attached hereto as Ex. 7).

AM-2201 is one of the four chemicals charged in the Indictment as alleged analogues of

JWH-018. Dr. Boos, the Government's expert chemist in this case, testified in *Fedida* that he

was the author of the "chemistry section" of a DEA monograph, dated May 2011, which

discussed the pharmacology of AM-2201.[13] However, this monograph plainly shows that DEA

speculated as to the pharmacological effects of AM-2201. Page six of the monograph states that,

"[b]ased on receptor binding affinities and structure activity relationships (SAR) analysis, *it is*

---

[13] Ex. 3, P. 255.

inferred that AM-2201 is likely to have substantially similar pharmacological effects on the central nervous system as the schedule I substance, JWH-018." DEA, *1-(5-Fluoropentyl)-3-(1-naphthoyl) indole (AM2201) Analogue Status* (May 2011). If DEA must guess ("infer") what pharmacological effects are "likely," how can it charge ordinary laymen with actual knowledge of these effects, and indict them for crimes based on such presumed knowledge? Despite the absence of positive scientific information, the DEA monograph nevertheless concluded that AM-2201 was an analogue of JWH-018. Unfortunately, because the DEA decided not to publish this monograph and make it available to the public prior to the Indictment in this case, Mr. Reece never had an opportunity to learn of the DEA's conclusion.[14]

One issue frequently encountered in Analogue Act cases is the use of two-dimensional "stick and letter" drawings of molecular structure to illustrate structural similarity. *See, e.g.*, *United States v. Klecker*, 348 F.3d 69 (4th Cir. 2003). Although these drawings are commonly used as a form of "short hand," they are too simplistic for use in the context of a criminal prosecution. Unfortunately, the government has often employed such overly simplified representations to support the inference of "substantial similarity." They should be excluded from evidence here. As averred by chemist Joseph Bono:

> Two-dimensional drawings are a commonly used form of chemical shorthand. However, molecules are in fact three-dimensional, and possess numerous characteristics that cannot be portrayed in two-dimensional renderings. Two-dimensional drawings are grossly inadequate for making legally outcome-determinative comparisons between chemical substances in the context of a criminal case. Molecules are active and not stagnant. The movement of molecules is not apparent through a stagnant configuration of the molecule, either in the two or three-dimensional depiction of the molecules.

Ex. 1, Aff. of Bono, at ¶ 9-10. *See also* Ex. 4, Aff. of Dr. McCarthy, at ¶ 7-8; *Roberts*, 363 F.3d at 124 (finding that visual similarity between substances standing alone was not enough to

---

[14] As of this writing, the government has not disclosed any human studies which establish proof of effect on the central nervous system of any of the four charged chemicals.

establish substantial similarity in chemical structure). Atoms and molecules have important characteristics such as molecular weight, bonding strength, and stereochemistry that cannot be represented in a simple two dimensional schematic drawing. *See, e.g.*, P. Anacker and E. Imwinkelried, *The Confusing World of the Controlled Substance Analogue Enforcement Act*, 42 Crim. L. Bull. 744 (2006) ("Objects such as atoms do not exist in only two dimensions; like human beings, they are three-dimensional.")[15]

In sum, the complete lack of statutory or regulatory standards for resolving the question of substantial similarity, the lack of scientific consensus as to the meaning of this term, and the absence of any human trials or tests data to determine whether the charged substances and JWH-018 have "substantially similar" pharmacological effects, demonstrates that there is simply no clear line delineating these substances as unlawful analogues. This lack of a "clear line" makes it manifestly unfair, and a violation of due process to require Mr. Reece to face the vagaries of a jury verdict as applied to the substances in this case.

### D. DEA DISOBEYED THE WILL OF CONGRESS, WHICH CLEARLY LIMITED ITS DELEGATION OF LEGISLATIVE POWER TO EMERGENCY SITUATIONS WHERE IMMEIDATE ACTION WAS "NECESSARY TO AVOID IMMINENT HAZARD TO PUBLIC SAFETY" AS NONE OF THE FOUR CHARGED SUBSTANCES PRESENTED SUCH A THREAT TO THE PUBLIC

The United States Constitution provides that, "[a]ll legislative power herein granted shall be vested in the Congress of the United States." U.S. Const., art. 1, § 1. Generally, Congress may not delegate its legislative power to another branch of government except under certain conditions. *Mistretta v. United States*, 488 U.S. 361, 371 (1980). Such delegation is only permissible when Congress articulates "an intelligible principle to which the person or body

---

[15] The Synthetic Drug Abuse Prevention Act of 2012 at § 1152(a)(2)(A)(i) & (ii) itself recognizes the three-dimensional character of molecules by utilizing stereo-chemical notations.

authorized to [act] is directed to conform." *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928).

     In a decision in the case that challenged the Attorney General's temporary scheduling authority as an unconstitutional delegation of legislative power, the Supreme Court upheld this delegation because Congress was found to have imposed "an intelligible principle" limiting the Attorney General's use of such legislative power. The Court held that Congress had articulated a clear requirement that the Attorney General's temporary scheduling authority be limited to instances where use of emergency powers was "necessary" because a certain substance presented an "imminent hazard to the public health." *Touby v. United States*, 500 U.S. 160 (1991). Significantly, in upholding the delegation the *Touby* court repeatedly emphasized that the Attorney General needed emergency powers because

> [i]t takes time to comply with these procedural requirements [for scheduling controlled substances under 21 USC Sec. 811 (a) and (b)]. ...Drug traffickers were able to take advantage of this time gap by designing drugs that were similar in pharmacological effect to scheduled substances but differed slightly in chemical composition, so that existing schedules did not apply to them. These 'designer drugs' were developed and widely marketed long before the Government was able to schedule them and initiate prosecutions.

*Id.* at 163-64.

     Thus, in view of the unique enforcement problem presented by 'designer drugs'—unlike the four charged chemicals here, which four chemicals were synthesized and made publicly available many years ago— Congress could constitutionally confer legislative power on the Attorney General on the condition that he use that power when "necessary" to avoid an "imminent hazard" to public health. One underlying purpose for Congress's articulating an "intelligible principle" when it delegates power to an executive agency is to enable a court in scrutinizing the exercise of that power to determine whether "the will of Congress has been

obeyed." *Yakus v. United States,* 321 U.S. 414, 425-26 (1944) (quoted in *Mistretta*, 488 U.S. at 379). In the present case, by expanding its emergency authority far beyond what was "necessary" to confront an "imminent hazard" to the public health -criminalizing four additional chemicals beyond the one drug, JWH-018, that caused the emergency-the DEA disregarded the "intelligible principle" that guided its emergency action.

Therefore, DEA's failure to "obey the will of Congress" invalidates its attempt to criminalize-for the first time the-four charged substances. This prosecution, more than most, is an exercise, or really an experiment, in agency and prosecutorial discretion. There was no law "on the books" that made any of the four substances illegal during the dates charged. The Analogue Act is not self-executing, and by bringing this Indictment the Attorney General has in effect proposed that this Court validate his decision to employ the Analogue Act as a means of expanding his temporary scheduling authority beyond the emergency that Congress specified. This Court should decline the invitation and dismiss the Indictment as to Mr. Reece.

### E. THE ATTORNEY GENERAL'S STATISTICAL INFORMATION DEMONSTRATES THAT THE FOUR CHARGED SUBSTANCES DID NOT PRESENT A PUBLIC HEALTH  EMERGENCY

The Attorney General, through the DEA's Office of Diversion Control, National Forensic Laboratory Information System (NFLIS), systematically collects results from "distinct drug cases" analyzed by state and local forensic laboratories. This is done in order to keep track of the frequency of abuse of different drugs throughout the United States. In fact, NFLIS's findings were relied upon by DEA in its final Order of March 1, 2011, temporarily placing JWH-018 on schedule I of the Controlled substances Act. 21 C.F.R. § 1308. In a recent compilation of findings, the National Forensic Laboratory Information System ("NFLIS"), reported on "distinct drug cases" for the period from January 2011 through June 2011. *See* NFLIS, 2011 Midyear

Report 4 (2011), http://www.deadiversion.usdoj.gov/nflis/2011midyear.pdf, attached hereto as exhibit 8. Table 1.1 of this report presents numbers and percentages for the twenty-five drugs most frequently identified by the reporting laboratories as having been found in drug seizures they analyzed. For the substance JWH-018, there were 2,336 reported cases amounting to 0.28% of the top twenty-five most frequently identified drugs. *Id.*

Significantly, not one of the four drugs charged in the Indictment as analogues of JWH-018 were found to have been abused at anywhere near the level of JWH-018. The closest of the charged substances to JWH-018 in terms of frequency of abuse, and the only chemical appearing on the top twenty-five list, is JWH-250. This substance was responsible for 1,380 cases and a percentage of 0.17%, which represents roughly half the volume reported for JWH-018. None of the other three charged substances is even listed among the top twenty-five. Page six of the NFLIS report discusses national and regional "drug trends," focusing on substances that showed an increase in patterns of abuse. *Id.* at 6. There is no mention of any of the four substances charged in the Indictment as having trended upward for the reporting period. Clearly, there is no evidence of an imminent public health emergency as to these substances.

Section two of the NFLIS report is entitled Major Drug Categories. These categories are stated as narcotic analgesics, tranquilizers and depressants, hallucinogens, anabolic steroids, and stimulants. Table 2.3 of the NFLIS report concerns hallucinogens, the category into which DEA has classified the substances charged in this case. *Id.* at 14. According to Table 2.3, in combination, all of the hallucinogens comprised 18,713 cases, or roughly 3% of the 706,677 "Total Drug Reports" analyzed during the reporting period. *Id.* Three of the substances in the Indictment are reported on this Table, including AM-2201, JWH-081, and JWH-250. *Id.* For AM-2201 there were 801 reported cases, or 4.28% of total hallucinogens, comprising only

.001% of "Total Drug Reports." *Id.* For JWH-081 there were 582 cases, or 3.11% of all hallucinogens analyzed, comprising only .0008% of "Total Drug Reports." *Id.* JWH-250 had 1,371 cases, or 7.33% of all hallucinogens, and .0019% of "Total Drug Reports." *Id.* The substance UR-144 does not appear in Table 2.3, or indeed anywhere in the report. This suggests there were no reported cases involving this chemical during the first six months of 2011. In summary, the DEA's NFLIS statistics for the first half of 2011 show relatively minimal levels of abuse of the four substances named in the Indictment. The DEA's numbers show these substances were used to a much lesser degree than JWH-018 and explain why the DEA chose not to include them on any schedule.

Nevertheless, by combining temporary scheduling power with the Analogue Act, the Indictment applies "emergency" measures to outlaw four substances that clearly presented no public health emergency at all. This was done in the face of DEA's own statistical analysis showing that no such emergency regulatory shortcut was warranted. There was simply nothing to justify treating AM-2201, JWH-081, JWH-250, and UR-144 differently from any other drugs which the DEA might seek to schedule subject to the protections of §811 (a)-(b) of the Controlled Substances Act.

**F.  CONGRESS DID NOT CONTEMPLATE THE USE OF TEMPORARY SCHEDULING IN CONJUNCTION WITH THE ANALOGUE ACT AS THE TEMPORARY SCHEDULING PROCESS DOES NOT REQUIRE SCIENTIFIC CONSIDERATION AND LACKS THE PROCEDURAL SAFEGUARDS OF THE REGULAR SCHEDULING PROCESS**

Temporary scheduling lacks the scientific findings and procedural safeguards built into the normal classification process for controlled substances. The process for scheduling a controlled substance is set forth in 21 U.S.C. § 811 (a)-(b). The statute requires the Attorney General to follow rigorous procedures before classifying a substance into one of the five

23

schedules in the Controlled Substances Act. As a critical prerequisite to initiating the rulemaking process, the Attorney General first must obtain a formal written scientific and medical evaluation from the Assistant Secretary for Health, who has been delegated this function by the Secretary of Health and Human Services ("HHS"). Section 811(b) provides that "[t]he Attorney General shall, before initiating [rulemaking proceedings] to control a drug or other substance and after gathering the necessary data, request from the Secretary [of HHS] a scientific and medical evaluation, and his recommendations, as to whether such drug or other substance should be so controlled." The Attorney General cannot classify anything as a schedule I or II controlled substance without the concurrence of the Secretary on all scientific and medical aspects. 21 U.S.C. § 811(b). If the Secretary disagrees, the drug is not scheduled. Moreover, in making a scientific evaluation the Secretary must consider all eight factors delineated in 21 U.S.C. § 811(c); including:

1. Its actual or relative potential for abuse;
2. Scientific evidence of its pharmacological effect, if known;
3. The state of current scientific knowledge regarding the drug or other substance;
4. Its history and current pattern of abuse;
5. The scope, duration, and significance of abuse;
6. What, if any, risk there is to public health;
7. Its psychic or physiological dependence liability; and
8. Whether the substance is an immediate precursor of a substance already controlled under this subchapter.

21 U.S.C. § 811(c).

The on-the-record formal rulemaking proceedings that follow after the Secretary's scientific and medical evaluation entail initial public notice in the Federal Register followed by a comment period, and a right to request a hearing pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 553(c), 556, 557. Specifically, § 811(a) provides that "[r]ules of the Attorney General under this subsection shall be made on the record after opportunity for a hearing pursuant to the

rulemaking procedures prescribed by [5 U.S.C. §§ 551-559]. This oral hearing process is quite unusual and exceeds the normal written comment process used in most "informal" rulemaking.[16] Persons affected by a final rule scheduling a new drug, (or removing, or rescheduling such drug), have the right to request an oral hearing, and also have the right to judicial review under which a court may "hold unlawful and set aside such agency action" if it is found to be "arbitrary, capricious, [an] abuse of discretion" or "otherwise not in accordance with law." 5 U.S.C. § 706. As a result of the foregoing process, when chemicals are scheduled as "controlled substances," they have first been subjected to substantial scientific analysis. Also, ample opportunity has been provided for the public both to be notified in advance of the proposed scheduling, and to provide public comments.

Temporarily scheduling a substance, however, is intended to be an emergency public health measure. It does not require scientific evaluation, does not invite public comment,[17] and is specifically not subject to judicial review. 21 U.S.C. § 811(h). *See United States v. Emerson*, 846 F.2d 541, 548 (9th Cir. 1988) (§ 811(h) "is an almost entirely different procedure"). For example, to temporarily schedule JWH-018 on March 1, 2011, the Attorney General did not have any obligation under the law to consider five of eight factors set forth in § 811(c) and (h): factors (1), (2), (3), (7) and (8). 21 U.S.C. § 811(c)(3). Instead, the Attorney General was only required to consider three ((4), (5) and (6)) of the eight factors in § 811(c). *Id.*

---

[16] *See* Jeffrey S. Lubbers, A Guide to Federal Agency Rulemaking 51 (5th ed. 2012) ("Formal rulemaking has always been the exception rather than the norm, and it is used infrequently today.") (footnotes omitted).

[17] The Notice initially published in the Federal Register advising of DEA's intent to temporarily schedule the listed substances did not invite any public comment. Schedules of Controlled Substances: Temporary Placement of Five Synthetic Cannabinoids Into Schedule I, 75 Fed. Reg. 71, 635 (Nov. 24, 2010).

Therefore, when he temporarily scheduled JWH-018, the Attorney General was not required to, and did not evaluate considerations of chemistry, pharmacology, or other science.[18] For this reason alone—the absence of any scientific consideration—Congress could not have intended that temporary scheduling be used to support a prosecution based on the Analogue Act. The Analogue Act is entirely science-based, focusing on chemical (molecular) structure and physiological effects on the central nervous system. Temporary scheduling specifically excludes any scientific issues and focuses entirely upon the extent to which use of a new drug is found to be causing a public health crisis. The notion is that during the temporarily scheduled period researchers can perform the scientific investigation that was initially deferred in order to respond to an emergency. To piggy-back the Analogue Act onto an exercise of temporary emergency power before scientific investigation is complete is wholly inconsistent with the Analogue Act's clear focus on chemistry and pharmacology. And, as argued above, it is also contrary to Congressional intent that the emergency power be used only for emergency situations. In fact, research has failed to locate a single reported—or unreported—decision in which this unique prosecutorial stratagem has been applied.

---

[18] In the case of JWH-018, on January 5, 2012, almost a year after the temporary scheduling action, the Assistant Secretary for Health submitted a recommendation to the DEA Administrator that this substance be *permanently* placed in schedule I of the Controlled Substances Act pursuant to 21 U.S.C. § 811(a), (b). On March 1, 2102, DEA proposed to permanently schedule JWH-018 (and several other chemicals) onto Schedule I. Schedules of Controlled Substances: Placement of Five Synthetic Cannabinoids Into Schedule I, 77 Fed. Reg. 12,508 (Mar. 1, 2012). It also extended the temporary scheduling for six months. However, this process was short-circuited when Congress enacted the FDASIA on July 9, 2012. Although the Assistant Secretary's recommendation did belatedly consider the drug's pharmacological effects and the current state of scientific knowledge as to January 2012, as required by factors (2) and (3) of 21 U.S.C. § 811(b), along with the other six statutory factors, the Assistant Secretary nevertheless acknowledged, that "[t]here are no formal, well-controlled data on the effects of JWH-018 in humans." 77 Fed. Reg. 12,508 (Mar. 1, 2012). All of the studies cited in the report involved rodents and monkeys. The Assistant Secretary's recommendation also relied on highly questionable data, including reports to Poison Control Centers nationwide "involving suspected JWH-018" in which it was "unknown how many of these calls were due specifically to JWH-018" because the substances ingested or smoked by the callers contained mixtures of different chemicals. *See* Ex. 9, Letter from Howard K. Koh, M.D., M.P.H., Asst. Secretary for Health, to Michele Leonhart, Administrator, DEA (Jan. 5, 2012).

**G. AS CONGRESS DID NOT EXPRESSLY STATE THAT TEMPORARILY SCHEDULED SUBSTANCES COULD BE PROSECUTED AS ANALOGUES, THIS COURT SHOULD NOT READ SUCH A PROVISION INTO THE ANALOGUE ACT**

When Congress passed the Analogue Act it carefully considered the existing provisions of Title 21, and took pains to specify which substances could be considered controlled substance analogues. Congress specifically provided that, in addition to scheduled substances, certain "listed" precursor chemicals in §§ 802(34) and (35) "used in manufacturing a controlled substance" could also be deemed analogues, if they otherwise fit the scientific definition in 21 U.S.C. § 802(32)(A). However, unlike precursor chemicals, Congress did not say that substances temporarily scheduled under § 811(h) could be considered as foundational drugs for the purpose of constituting other substances as their analogues.

This congressional omission was intentional. First, as discussed above, to allow the criminalization of alleged analogues of temporarily scheduled substances would eliminate the requirement of "imminent hazard" to public health which is the "intelligible principle" validating the Congressional delegation. Second, because temporary scheduling is science-free, it is plainly incompatible with the Analogue Act's scientific proof requirements. Third, the absence of safeguards such as formal rule making and judicial review, and especially the requirement for concurrence of the Secretary of HHS, all militate against using temporary scheduling as a foundation for prosecution under the Analogue Act. The DEA's unilateral and judicially unreviewable discretion to place a substance in Schedule I for two years or more has profound effects on liberty interests.[19]   Under 21 U.S.C. § 813, with the exception of mandatory minimums, the punishment applicable to analogues is as harsh as that for any schedule I

---

[19] *See* Food and Drug Administration Safety and Innovation Act § 1153, Pub. L. 112-144 (2012) (amending 21 U.S.C. § 811(h)(2) to lengthen the limit for temporary scheduling from one year to two years, and the extension period from six months to one year).

controlled substance. In view of the severity of potential penalties, this Court should not extend the reach of this criminal statute by presuming Congress to have intended a result which it did not clearly express. "Due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area, where we typically find a 'narrow interpretation' appropriate." *Dowling,* 473 U.S. at 213.[20]

### H. DEA CLEARLY DID NOT INTEND TO CREATE ANALOGUES OF TEMPORARILY CONTROLLED SUBSTANCES AS IT DID NOT REFERENCE THE ANALOGUE ACT

The DEA Order states that it "meets the applicable standards set forth in Sections 3(a) and 3(b)(2) of Executive Order 12988–Civil Justice Reform." That Executive Order required the DEA to "make every reasonable effort to ensure...that the regulation, as appropriate—specifies in clear language *the effect on existing Federal law or regulation, if any*" and "provides a clear legal standard for affected conduct rather than a general standard." Executive Order 12988, 61 Fed. Reg. 4,729 (Feb. 7, 1996) (emphasis added). Additionally, Executive Order 12988 requires that in issuing its regulation, DEA "address[] other important issues affecting clarity." *Id.*

---

[20] The extension of the Analogue Act to substances which are temporarily banned creates a conundrum demonstrating the lack of congressional intent for the Act to apply to substances banned on a temporary emergency basis. Prosecution of substances as analogues of substances which are temporarily controlled leaves open the possibility that an individual can be indicted for the possession or distribution of an analogue of a temporarily banned substance, only to have the substance ultimately not be permanently scheduled (after the conviction). Take, for example, the substance 1-(3-trifluoromethylphenyl)-piperazine ("TFMPP"), which was banned on a temporary emergency basis for one year on September 20, 2002, and extended for an additional six months on September 10, 2003. 67 Fed. Reg. 59,161 (Sept. 20, 2002); 68 Fed. Reg. 53,289 (Sept. 10, 2003). However, instead of scheduling TFMPP on a permanent basis, on March, 18, 2004, the DEA removed TFMPP from the temporary scheduling and announced the substance would not be scheduled under the CSA. 69 Fed. Reg. 12794 (Mar. 18, 2004) (removing TFMPP as a temporarily scheduling 's temporary scheduling "under recommendation of the Food and Drug Administration (FDA) and a scientific evaluation of the National Institute on Drug Abuse (NIDA), the DHHS did not recommend control of TFMPP.") Consequently, had the government obtained a conviction for possession or distribution of an analog of TFMPP during the duration for which the substance was temporarily scheduled, the result would have been unjust and contrary to the intent of the Analogue Act in that an individual would be convicted in relation to a substance no longer capable of being considered an analogue after the expiration of the time period for temporary scheduling expires.

Given the admonition provided by the Executive Order to specify the Order's effect on "existing Federal law," the DEA clearly did not intend its Order temporarily scheduling JWH-018 to create analogues. Although considered synthetic cannabinoids by the Agency, the DEA did not include any of the four chemicals or reference them in the Order. More important, the DEA Order *did not* state that by identifying JWH-018 as a temporarily controlled substance the Order also criminalized (unspecified) analogues of JWH-018 under 21 U.S.C. § 813.

I. **THE FOUR CHARGED CHEMICALS WERE SYNTHESIZED FOR LEGITIMATE MEDICAL RESEARCH PURPOSES LONG AGO AND ARE NOT "DESIGNER DRUGS" CREATED TO MIMIC JWH-018**

The Indictment alleges that a "controlled substance analogue is a 'designer drug' that resembles a controlled substance." Doc. 57, Ct. 1 ¶ 1 A. In passing the Analogue Act, Congress intended to "prevent scientists from slightly modifying the chemical structure of banned drugs to create new 'designer drugs' that would have similar physiological effects but would not be covered by the law's controlled substances schedules." *United States  v. Turcotte*, 405 F.3d 515, 523 (7th Cir. 2005); *Forbes*, 806 F. Supp. at 238 ("Congress declared that the purpose of the statute is to attack underground chemists who tinker with the molecules of controlled substances to create new drugs that are not yet illegal."). The Analogue Act was first introduced as the Designer Drug Enforcement Act of 1985 (S. 1417), the stated purpose of which was to "prevent persons who specifically set out to manufacture or distribute drugs which are substantially similar to the most dangerous controlled substances from engaging in that activity."  S. Rep. No. 196, 99th Cong., 1st Sess. 5 (1985). The Senate Judiciary Committee reported that "law enforcement authorities find themselves one step behind underground chemists who slightly alter the molecular structure of controlled substances to create new drugs." *Forbes*, 806 F. Supp. at 235. As the Fifth Circuit noted, "[t]he statute makes plain that *drugs which have been chemically*

*designed to be similar to controlled substances*, but which are not themselves listed on the controlled substance schedules, will nonetheless be considered as schedule I substances if" they satisfy the other elements of 21 U.S.C. § 802(32) (A). *United States v. Granberry*, 916 F.2d 1008, 1010 (5th Cir. 1990) (italics supplied).

If a person synthesizes a "designer" drug by starting with a known controlled substance and engineering slight variations in its molecular structure in order to make a new drug intended to evade schedule I, that person clearly knows that his or her new substance is "substantially similar" to the controlled substance on which it was based, and is therefore its illegal analogue. In *Touby*, a case in which the U.S. Supreme Court upheld Congressional delegation of emergency scheduling power to the Attorney General, the Court was clearly under the impression that the Attorney General would be using his power against the "designer drug" problem. *Touby*, 500 U.S. at 162. As discussed above, the Court noted the lack of time to employ normal scheduling processes when drug traffickers could design and distribute new drugs faster than the government could schedule them. *Id.* at 162. Perhaps, if the Analogue Act were truly applied only to "designer drugs" as Congress intended, it would not suffer from a vagueness problem.

However, the four chemicals charged in the Indictment do not fit the above mold, nor do they fall within the scope of the Act's intended purpose. They are not "designer drugs," and they were not created to circumvent the Controlled Substances Act by "tweaking" the molecules of existing controlled substances. The four chemicals were initially synthesized for legitimate medical research purposes years before the relevant dates in the Indictment. For example, Alexandros Makriyannis, Professor of Medicinal Chemistry at Northeastern University, invented AM-2201 around the year 2000, and together with the University of Connecticut, obtained an

international patent in 2001,[21] and a United States patent in 2005,[22] which both included the intended purpose of the research, noting the chemicals:

> represent potentially useful materials for providing a physiological effect to treat pain, peripheral pain, glaucoma, epilepsy, nausea such as associated with cancer chemotherapy, AIDS Wasting Syndrome, cancer, neurodegenerative diseases including Multiple Sclerosis, Parkinson's Disease, Huntington's Chorea and Alzheimer's Disease, mental disorders such as Schizophrenia and depression; to prevent or reduce endotoxic shock and hypotensive shock; to modulate appetite; to reduce fertility; to prevent or reduce diseases associated with motor function such as Tourette's syndrome; to prevent or reduce inflammation; to provide neuroprotection and to effect memory enhancement.

International Publication No. WO/0128557 A1, at [4-5] (filed Oct. 18, 2000); U.S. Patent No. 6,900,236, at [3] (filed Oct. 18, 2000).

Two of the other chemicals, JWH-081 and JWH-250, were both synthesized many years ago by Dr. John W. Huffman of Clemson University, whose research was funded by a grant from the National Institute of Drug Abuse. The fourth, UR-144, was developed by a researcher at Abbott Laboratories, and an international patent was first filed for a class of substances including UR-144 in 2006.[23] The patent application described the aim of these substances as follows:

> Nociceptive pain is the most well-known type of pain...Examples of chronic nociceptive pain include osteoarthritis, rheumatoid arthritis, and musculoskeletal conditions (e.g., back pain), cancer pain, etc. Neuropathic pain is defined as "pain initiated or caused by a primary lesion or dysfunction in the nervous system"... The three most commonly diagnosed pain types of neuropathic nature are diabetic neuropathy, cancer neuropathy, and HIV pain. In addition, neuropathic pain is diagnosed in patients with a wide range of other disorders, including trigeminal neuralgia, post-herpetic neuralgia, traumatic neuralgia, phantom limb, as well as a number of other disorders of ill-defined or unknown origin. Managing the spectrum of pain etiologies remains a major public health problem and both patients and clinicians are seeking improved strategies to effectively manage pain. No currently available therapies or drugs effectively treat all types of nociceptive and neuropathic pain states. *The compounds of the present invention are novel CB2 receptor modulators that have utility in treating pain, including nociceptive and neuropathic pain.*

---

[21] International Publication No. WO/0128557 (filed Oct. 18, 2000).
[22] U.S. Patent No. 6,900,236 (filed Oct. 18, 2000).
[23] International Publication No. WO/06916 (filed Dec. 21, 2005).

International Publication No. WO/06916, at [2] (filed Dec. 21, 2005) (emphasis added).

In short, academic researchers created these four chemicals for the legitimate and lawful purposes of research, and assisting in the management of various medical conditions. They were not "designer drugs" created as work-arounds for JWH-018, nor were they synthesized to mimic JWH-018. To the contrary, these substances have been available for years. There is nothing about them that would serve to give anyone notice that they are "analogues" of other scheduled substances. Moreover, since these substances were well known, and DEA's own NFLIS data show they have not been widely abused, the DEA could have-and should have-criminalized these substances pursuant to the normal scheduling process under 21 U.S.C. § 811(a)-(b).

## J.   THE FOUR CHARGED SUBSTANCES STAND IN STARK CONTRACT TO PREVIOUS ANALOGUE CASES

In previous cases where courts have rejected vagueness challenges to the Analogue Act they have relied *almost entirely* on the notice provided to the public or the defendant by either a statute, legislative history, or a regulation which identified a specific substance or chemical as a controlled substance analogue. For example, a number of courts rejected vagueness challenges involving analogues of the controlled substance GHB because its analogue, GBL, was actually identified by the statute that scheduled GHB, and the regulation that implemented it. *See, e.g.*, *Ansaldi*, 372 F. 3d at 122-23 ("GBL is one of the substances that the statute actually identifies as a potential controlled substance analogue" and "[r]egardless of any other way in which the laws governing controlled substance[s] might be vague, there is one thing they make perfectly clear— the sale of GBL for human consumption is illegal"); *United States v. Fisher*, 289 F.3d 1329, 1335 (11th Cir. 2002) ("the public was given notice that all GBL analogues were illegal when Public Law 106-172 was enacted on February 18, 2000, and again when the DEA's Final Rule

appeared in the Federal Register on March 13, 2000, at the direction of Congress, designating GHB a Schedule I controlled substance."); *Washam*, 312 F.3d at 931 ("explicit notice" was given of these analogues' status at 21 C.F.R. § 1310).

Other cases rejecting vagueness challenges to the Analogue Act concerned the drug MDMA, alleged to be an analogue of the schedule I controlled substance MDA. Courts pointed to specific references in the legislative history of the Analogue Act putting the public on notice of MDMA's illegality. *See, e.g.*, *United States v. Desurra*, 865 F. 2d 651, 653 (5th Cir. 1989) ("The legislative history of the Analogue Act makes clear that MDMA is a controlled substance analogue."); *United States v. Carlson*, 87 F. 3d 440, 444 (11th Cir. 1996) ("One catalyst for passing the Analogue Act was 'the development of MDMA by drug dealers trying to escape regulation of MDA [a Schedule I controlled substance]'") (citing, *inter alia*, S. Rep. No. 99-196 (1985)).

In contrast to the GBL and MDMA analogue cases, neither Congress, the DEA, nor any prior federal case provided notice to Mr. Reece that the four charged chemicals here were analogues of JWH-018. They were not mentioned in the Analogue Act itself, its legislative history, the Federal Register, the DEA's Order temporarily scheduling JWH-018, DEA's website, or in any other DEA guidance prior to the relevant dates in the Indictment. As the Second Circuit noted in *Roberts*:

> It is perhaps unfortunate that Congress did not opt to list known controlled substance analogues itself, and then to delegate to an appropriate designee...the authority to expand that list as necessary, but rather left the determination of what qualifies as a controlled substance analogue to the courts and to informal legislative or administrative commentary.

363 F.3d at 124, n.3.

Moreover, there have been no prior federal cases addressing the four chemicals until roughly around the same time as the Indictment as to the Defendant, which was returned on July 10, 2012,[24] and certainly no reported federal decisions finding that any one of the four chemicals was a controlled substance analogue. Thus, in this present case, unlike almost all of the prior analogue cases addressed by courts, the failure of the government and the courts to provide notice to Mr. Reece (or anyone else) that the charged chemicals were controlled substance analogues should lead to the dismissal of the Indictment as to Mr. Reece.

K. **AS AN ADMINISTRATIVE AGENCY ISSUING A REGULATORY ORDER, DEA FAILED IN ITS DUTY TO PROVIDE FAIR WARNING THAT ITS ORDER EXTENDED TO ANALOGUES AND THAT IT CONSIDERED THE FOUR CHARGED CHEMICALS TO BE ANALOGUES**

As an administrative agency promulgating regulations, such as its emergency order scheduling JWH-018, DEA had a legal duty to give "fair warning of the conduct it prohibits or requires." *General Electric Co. v. EPA*, 53 F.3d 1324, 1328-34 (D.C. Cir. 1995) ("fair notice" requirement applies in the civil administrative context).  An agency, such as DEA, may not deprive a party of property by imposing civil or criminal liability where its "regulation is not sufficiently clear to warn a party about what is expected of it." *Id.* When, as in this case "sanctions are drastic," then "elementary fairness compels clarity" in the statements and regulations setting forth the actions with which the agency expects the public to comply. *Radio Athens, Inc. v. FCC*, 401 F.2d 398, 404 (D.C. Cir. 1968). As the Supreme Court recently observed,

---

[24] In a recent state case under Ohio's version of the federal Analogue Act the trial court entered an order excluding from evidence the state's  laboratory report and expert chemist's testimony  that AM-2201 was "substantially similar" to JWH-018. Judge John J. Russo held  that "substantially similar" was " too vague to be properly implemented" and  invited  an "unguided subjective testing procedure." *See State v. Mahi Silmi*, Case No. Cr. 56174, Journal Entry & Opinion (OH Cuyahoha Co. C.P. Feb. 7, 2013).

> [I]t is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.

*Christopher v. SmithKline Beecham Corp.*, __ U.S. __, 132 S. Ct. 2156, 2168 (2012).

Reviewing the factors outlined above, DEA clearly failed to provide adequate warning that it interpreted its DEA Order to extend to analogues of JWH-018. First, as outlined in the initial part of the Memorandum, DEA certainly did not make clear that a temporary, emergency scheduling order extended to analogues of the emergency scheduled substances. In turn, no prior DEA temporarily scheduling order had ever been applied in such a manner. As its temporary scheduling Order was issued by it without opportunity for public comment or judicial review, and without consideration of all of the factors that go into normal scheduling decisions, DEA certainly had a responsibility to inform the public that it interpreted its Order to extend to analogues of the named substances. Second, the DEA Order does not mention the Analogue Act or 21 U.S.C. § 813, even though Executive Order 12988 required that DEA explain in its Order "in clear language *the effect on existing Federal law or regulation, if any*." Executive Order 12988, 61 Fed. Reg. 4,729 (Feb. 7, 1996).

Third, even after reaching an internal decision classifying one of the charged substances as an analogue of JWH-018, DEA appears to have intentionally withheld from the public notification of its conclusion. DEA Chemist Dr. Terrence Boos testified that DEA determined that UR-144 was an analogue in "early 2012," and on behalf of DEA wrote a monograph to that effect.[25]  However, the DEA did not publish that document at that time, or even today. Ex. 3, P. 255. When asked in December 2012, a date which proceeds the Indictment in Mr. Reece's case, where "anyone could go to look to find out that the United States of America considers UR-144

---

[25] Ex. 3, P. 255.

to be an unlawful analogue of JWH-018," Dr. Boos responded, "I am trying  to think. We have recently placed onto our website a drug and chemical–it's a drug and chemical of concern...I believe it was probably last month. Late October or November [2012]." *Id.* at P. 256.  Indeed, the DEA's posting regarding UR-144 occurred after the Indictment in this case.[26] With the exception of UR-144, which was added in the late fall of 2012, DEA did not list any of the other three chemicals at issue here on its website as "chemicals of concern," nor did it post on its website that it considered these four chemicals to be analogues of a controlled substance.

The DEA's neglect to provide the public notice of its concerns regarding UR-144 is contrary to other instances where the DEA has concluded that a chemical is a controlled substance. For example, in the case of HU-210, upon concluding that HU-210 is a chemical of concern, DEA made its views clear to the public through its inclusion of the chemical among its "Drugs and Chemicals of Concern" on or before March 20, 2009.[27] Then, in July 2009, the DEA posted on its website a monograph concerning the substance HU-210, which stated that the chemical is "structurally and pharmacologically similar to THC, the main active ingredient of marijuana."[28] Significantly, DEA decided to issue this public notice even though it also concluded that its NFLIS system, which collects national drug usage data, contained *no* reports of the abuse of HU-210.

---

[26] *Compare* Ex. 10, DEA, Drugs and Chemicals of Concern, http://www.deadiversion.usdoj.gov/drugs_ concern/index. html (last visited Dec. 13, 2012) (showing UR-144 is not listed as a "chemical of concern" on July 25, 2011) *with* Ex. 11, DEA, Drugs and Chemicals of Concern,  http://www.deadiversion. usdoj.gov/drugs_concern/index. html (last visited Dec. 3, 2012) (listing UR-144 as a "chemical of concern" on December 3, 2012).  Note the DEA still does not list UR-144 as an analogue.

[27] *See* Ex. 12, DEA, Drugs and Chemicals of Concern, Mar, 20, 2009, http://web.archive.org/web/ 20090320033148/http://www.deadiversion.usdoj.gov/drugs_concern/index.html (last visited Dec. 3, 2012) (listing HU-210 as a "chemical of concern" on March 20, 2009).

[28] *See* Ex. 13, DEA, Drugs and Chemicals of Concern: HU-210, July 2009, http://www.deadiversion. usdoj.gov/drugs_concern/spice/spice_hu210.htm  (last visited Dec. 3, 2012)  (providing information on HU-210).

In short, DEA failed in its responsibility as an administrative agency to inform the public and Mr. Reece that its temporary emergency prohibition of JWH-018 extended to analogues of that substance, despite numerous opportunities to do so. Now, with terrible consequences for Mr. Reece, DEA and the Department of Justice seek to combine the DEA Order with the Analogue Act to impose criminal sanctions on Mr. Reece, including the threat of imprisonment. Such measures simply do not comport with the "elementary fairness" expected of an administrative agency whose regulations have the force of criminal laws.

### L. <u>THERE WAS WIDESPREAD BELIEF THAT SUBSTANCES, SUCH AS THE FOUR CHARGED IN THIS CASE, WERE LEGAL</u>

The public record shows that key members of Congress, law enforcement officials, and the general public considered substances such as the four charged chemicals either to be legal or, at minimum, had serious doubt as to their illegality. This fact alone is another compelling illustration of the Analogue Act's vagueness as applied to this case. *See Forbes*, 806 F. Supp at 237 (one element of analyzing whether Analogue Act was unconstitutionally vague as applied was the defendant's belief that the analogue was not a controlled substance, that the analogue was freely available for purchase through the mail, and that the government had not scheduled it as a controlled substance after many years). In fact, there was a common understanding that individuals could not be prosecuted in relation to the charged substances, or to other synthetic cannabinoid substances that existed during the relevant time period.

Given the public's widespread belief that "synthetics" were legal, the law enforcement community began taking steps only *in the last few months* to warn the public that it considered synthetics to be illegal analogues. For example, in June 2012, a year after the four chemicals allegedly became controlled substance analogues, and after the time period defined in this Indictment, the U.S. Attorney for the Western District of West Virginia sent a letter to business

owners in his district publically acknowledging that "[b]usiness owners may mistakenly believe the sale of these synthetic substances is legal," and informing them that such substances may be illegal if they are "marketed for human consumption" and are "chemically similar to a scheduled illegal drug."[29] Given the apparent belief as to the legality of these substances, the U.S. Attorney informed businesses that "[l]ocal law enforcement is prepared to help business owners dispose of these substances should they choose to cease and desist in their commercial distribution."[30] *Id.*

Similarly, even well informed members of Congress who were active in working on the legislation that ultimately led to the legislative scheduling of the four chemicals effective July 2012, did not believe these substances were unlawful under the Analogue Act. As discussed above, members of Congress never contemplated that an Analogue Act prosecution could be based on a substance that had been classified under the DEA's temporary scheduling powers, and as a result, they thought that synthetic cannabinoids, such as the four charged chemicals, were still lawful. For example, speaking in support of Senate Bill 3189, which proposed banning various substances, including three of the four named in this Indictment, Senator Klobuchar remarked:

> Luckily, the Drug Enforcement Administration is taking its own action and has temporarily banned some synthetic drugs, but most of the substances in these bills have not been banned, including all of the substances in my bill.  On the state level, roughly 40 States have banned some synthetic drugs, including Minnesota, where a major law regarding synthetic drugs took effect in July. But that means that some States have not banned any of these drugs yet and some have banned only certain types, so people can go to other States to buy them legally or buy them on the Internet. That is one of the reasons we need this Federal law.

*            *            *

---

[29] *See* Ex. 14, Letter from Timothy Heaphy, U.S. Attorney, Western District of Virginia (June 12, 2012).

[30] Other U.S. Attorneys took similar measures to warn the public. During a news conference held on August 2, 2012, the U.S. Attorney for South Dakota informed the public about "analogues" and "warned users and sellers that just because a compound isn't listed as a controlled substance, that doesn't mean it's legal." Andrea J. Cook, *U.S. Attorney Warns Against Copycat Drugs*, Rapid City J., Aug. 2, 2012, attached hereto as exhibit 15.

> That is why, for the sake of that law [sic] community, it is important we get it on that Federal list and we also make it very clear it is banned. Passing a Federal law will help create a partnership and will send a strong message that we need to eradicate these substances.

158 Cong. Rec. S. 680-81 (Feb. 15, 2012) (statement of Sen. Klobuchar).

Congressman Joe Pitts, in supporting H.R. 1254 to permanently classify as schedule I drugs three of the substances named in the Indictment (JWH-250, JWH-081, and AM-2201), said:

> These synthetic drug substitutes, made from chemical compounds that are sold legally in most States, mimic the hallucinogenic and stimulant properties of drugs like marijuana, cocaine, and methamphetamines. While these synthetic drugs are just as dangerous as their traditional counterparts, they are not illegal. Many families and young people in our communities do not realize the destructiveness of these synthetic drugs because of their legal status and their wide availability.

157 Cong. Rec. 187, H8238-39 (Dec. 7, 2011) (statement of Rep. Pitts).

During the same hearing, Congressman Pallone made a similar statement which also demonstrates that the Congressman did not know the charged substances were illegal at the time, stating "[u]nfortunately these imitation drugs are not illegal." 157 Cong. Rec. 187, H8239 (Dec. 7, 2011) (statement of Rep. Pallone). Representative Pallone continued to state:

> The fact that these drugs are legal in many States contributes to the misconception that they are safe...A growing number of States, including Pennsylvania, have enacted bans on many forms of synthetic drugs, but Federal action is necessary to prevent these drugs from being obtained...State-by-State differences in which individual substances are controlled and how strongly makes for a confusing legal patchwork, and Federal legislation certainly will facilitate enforcement.

*Id.*

According to the Indictment in this case, these four chemical substances became illegal as soon as JWH-018 was temporarily scheduled in March 2011. However, Senator Klobuchar and Congressmen Pallone and Pitts certainly did not understand that to be the case. Moreover, based

39

on the foregoing statements, none of these legislators believed anyone could be prosecuted for possession of the substances in this Indictment based on the March 1, 2011, temporary scheduling of JWH-018, combined with the Analogue Act. Consequently, these congressmen, along with many other legislators, believed passage of new legislation was necessary. If Senator Klobuchar and Congressmen Pitts and Palone did not believe that AM-2201, JWH-081 and JWH-250 were unlawful, then how could Mr. Reece, or any layman, be expected to have known otherwise?

The evident public confusion concerning whether "synthetics," such as the four charged chemicals, are illegal; efforts by law enforcement to notify the public that their views were mistaken; and the decision by law enforcement in many instances not to prosecute businesses, but to permit them instead to "dispose of such substances"; collectively demonstrate that any indictment premised on the Defendant's having fair notice that the four charged chemicals were illegal analogues is unreasonable and unfair.

### III. CONCLUSION

WHEREFORE, Premises Considered, and for the reasons set forth above and in the corresponding motion, the Defendant, Alexander D. Reece, requests the Court to dismiss Counts I and III of the Superseding Indictment as to Mr. Reece. Given the complexity of the matters, disputed question of law, and the need to establish preliminary facts, the Defendant requests a hearing in this matter.

Dated: March 29, 2013

Respectfully submitted,

___/s/ Todd Foster_____
TODD FOSTER
(Admitted Pro Hac Vice)
Florida Bar No.: 0325198
tfoster@tfosterlaw.com
CHRISTINA KIMBALL WALKER
(Admitted Pro Hac Vice)
Florida Bar No.: 0085093
ckimball@tfosterlaw.com
**TODD FOSTER LAW GROUP**
1881 W. Kennedy Blvd.
Tampa, FL 33606
Telephone: (813) 229-7373
Facsimile:  (813) 280-9981
*Attorneys for Alexander D. Reece*


___/s/ Michael D. Skinner_____
MICHAEL D. SKINNER #12118
SKINNER LAW FIRM, L.L.C.
600 Jefferson Street, Suite 810
P. O. Box 53146
Lafayette, LA 70505
337-354-3030 Telephone
337-354-3032 Facsimile
mike@law.glacoxmail.com
*Attorney for Alexander D. Reece*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this 29th day of March, 2013 a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Assistant United States Attorneys J. Collin Sims and John Luke Walker by operation of the Court's electronic filing system.

_\_\_/s/ Todd Foster_____
TODD FOSTER
(Admitted Pro Hac Vice)
Florida Bar No.: 0325198
tfoster@tfosterlaw.com
**TODD FOSTER LAW GROUP**
1881 W. Kennedy Blvd.
Tampa, FL 33606
Telephone: (813) 229-7373
Facsimile:  (813) 280-9981
