# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 12-CR-00146 (08)** |
| **VERSUS** | **DISTRICT JUDGE FOOTE** |
| **DANIEL JAMES STANFORD (08)** | **MAGISTRATE JUDGE HANNA** |

## POST-HEARING BRIEF

Defendant, DANIEL JAMES STANFORD (hereinafter "Stanford"), pro se, respectfully submits this Post-Hearing Brief following the April 26, 2013 and May 2, 2013 hearings on Stanford's Motion to Dismiss Superceding Indictment for Prosecutorial/Governmental Misconduct and Request for an Evidentiary Hearing on Motion (Doc. 313). Stanford also incorporates his Memorandum in Support of the Motion to Dismiss Superceding Indictment for Prosecutorial/Governmental Misconduct (Doc. 313-1) into this post-hearing brief by this reference.

## I.    Introduction/Background

Richard Buswell co-owned and operated Bowman Investment Group, LLC. On or about May 2009, Financial Industry Regulatory Authority (hereinafter "FINRA") initiated an investigation into Richard Buswell and others.[1] On or about July 2010, a complaint was issued against Richard Buswell and others.[2] There were also civil proceedings brought against Richard Buswell in federal district court, Lafayette Division.

In approximately January 2010, Richard Buswell and Patrick Chavin (hereinafter "Mr.

---

[1]    FINRA Department of Enforcement, Complainant; Richard Buswell, Herbert S. Fouke, Brookstone Securites, Inc., Anthony L. Turbeville, David W. Locy, and Mark M. Mercier, Respondents. Disciplinary Proceeding Number 2009 017275301.

[2]    *Id.*

Chauvin") purchased Curious Goods, LLC from Jack Leblanc.[3]  Curious Goods LLC was an adult novelty retail store that consisted of only one (1) store located in a shopping center on the north side of Lafayette.  Jack Leblanc owned and ran Curious Goods for over fifteen (15) years.[4]  From approximately October through December 2010, Richard Buswell and Mr. Chauvin made purchases from Drew Green (hereinafter "Mr. Geen") and Thomas Malone (hereinafter "Mr. Malone").[5]  In January 2011, Richard Buswell and Mr. Chauvin opened a second Curious Goods LLC location on Kaliste Saloom Road.  In January 2011,  Richard Buswell and Mr. Chauvin traveled to Atlanta, Georgia and visited with Mr. Green and Mr. Malone at their production and manufacturing facility.  Mr. Green and Mr. Malone had created a line of products called "Mr. Miyagi."[6]  During that trip, Richard Buswell and Mr. Chauvin were introduced to Boyd Barrow (hereinafter "Mr. Barrow").  They were told that Mr. Barrow marketed and distributed all of the Mr. Miyagi products through his company, Pinnacle Products.[7]  Soon thereaftrer, Curious Goods LLC began receiving Mr. Miyagi products for sale in their stores.  In February 2011, Richard Buswell and Mr. Chauvin attended the CHAMPS trade show in Las Vegas.  They saw and visited with Mr. Green, Mr. Malone, and Mr.

---

[3]     May 14, 2012, Conflicts hearing pgs 8-9; May 2, 2013, Misconduct hearing pg 12.

[4]     Jack Leblanc had sold various brands and/or types of "potpourri" for years and had initiated the advertising slogan "Curious Jack says nope to dope and word to legal herb." See, Transcript, February 15, 2012, interview of Paul Buswell at pg 60.

[5]     Drew Green and Thomas Malone are co-defendants.  Mr. Green and Mr. Malone owned and/or operated NutraGenomics and numerous other companies.

[6]     Mr. Green and Mr. Malone created the Mr. Miyagi product approximately in the spring of 2010.

[7]     Boyd Barrow is co-defendant.  Mr. Barrow owned and operated Pinnacle Products.  Mr. Barrow had an exclusive deal with Mr. Green and Mr. Malone that granted him the right to market and distribute the Mr. Miyagi product line.

Barrow who had company booths at the trade show.

In March 2011, Curious Goods LLC began working on a franchise concept.  In May 2011, Curious Goods LLC had their franchise concept and franchise agreements and/or contracts completed. In June 2011, Curious Goods LLC began business negotiations with  potential franchisees.  The first franchise agreement/contract was executed in July 2011.  Thereafter, Curious Goods  sold several Curious Goods franchise stores.[8]  On September 29, 2011, Richard Buswell was served with a federal criminal complaint notifying him that he was being charged inter alia, securities fraud.[9]  On or about September 2011, FINRA moved for a default decision as to Richard Buswell and Herbert S. Fouke.[10]  On October 14, 2011, Richard Buswell attended his initial appearance and arraignment.   Richard Buswell plead not guilty to all counts and was released on pre-trial supervision.

In October and/or November 2011, Lafayette Metro Narcotics agents made "undercover" over-the-counter retail purchases of a Mr. Miyagi product.[11]  On December 7, 2011, Curious Goods LLC held a meeting at Richard Buswell's residence for franchise owners.   Joshua Espinoza (hereinafter "Mr. Espinoza") drafted a meeting agenda and conducted the meeting.  On that day, two

---

[8]      Franchise stores exist as separate corporate entities pursuant to a detailed Franchise Agreement..

[9]      Docket Number 11-CR-00198.  Herbert S. Fouke was also indicted and is a co-defendant.

[10]      Herbert S. Fouke is a co-defendant in 11-CR-00198.

[11]      These products were later sent to the Acadiana Crime Lab for analysis.

(2) individuals each purchased Curious Goods franchise store from Curious Goods LLC.[12]  On December 8, 2011, Lafayette Metro Narcotics executed search and arrest warrants at both Curious Goods LLClocations,  Northside and Kaliste Saloom, and also at Richard Buswell's residence.

Richard Buswell was arrested on December 8, 2011 and bonded out of jail.  Between December 9, 2011 and December 15, 2011, three (3) hearings were held to determine whether Richard Buswell would be continued on pretrial release or ordered detained.  On December 15, 2011, the Court terminated Richard Buswell's pretrial release and ordered that he be detained pending trial. Thereafter, the government listened to every jail call Richard Buswell made on a daily and on going basis through to the present time.

Lafayette Metro Narcotics and the government were working a joint investigation into Curious Goods LLC and the franchise stores.   Over forty (40) individuals were interviewed.  Some interviews were recorded without the individuals' knowledge. In January 2012, the government determined that they wanted to interview Richard Buswell without his lawyer being present.  State agencies and federal agencies worked jointly towards this endeavor.  The government approached Paul Buswell through numerous telephone and face-to-face interviews.   Some of the Paul Buswell telephone calls and face-to-face interviews were recorded and others were not.  The government did not give any reason why.  The government's objective was to get Paul Buswell to convince Richard Buswell to agree to an interview without his lawyer being present.  The government's plan was to: 1) listen to Richard Buswell's jail calls to determine the right time to approach him; 2) use a pretext situation to gain face-to-face access to Richard Buswell; and 3)  use the face-to-face contact with

---

[12]  Curious Goods LLC, Northside and Kaliste Saloom Rd.,  is the corporate store and franchise store are separate entities existing separate and apart from the corporate store. (May Transcript pgs 89-90).

Richard Buswell as a springboard to conduct a full blown interrogation of Richard Buswell. The government believed that Richard Buswell would provide the "smoking gun" evidence against Stanford since there is no substantive or tangible evidence that Stanford committed any wrongdoing.

Government agents and prosecutors had a meeting where they discussed operation Richard Buswell. The government was going to use the pretext of having to serve "forfeiture paperwork" on Richard Buswell to initiate a face-to-face meeting. The government felt confident that Richard Buswell would talk once he was in the presence of the agents. The government believed that the information they would gain from Richard Buswell was important enough to outweigh the constitutional and ethical violations created by the pretext of serving defective "forfeiture paperwork" to make contact with a represented party who is incarcerated. The government monitored every single call Richard Buswell made from the Iberia jail to determined the best time to approach him.

The government knew that Richard Buswell was represented by Stanford for the pending state drug charges, property seizures, and federal securities fraud case. The government should never have directed agents to have contact with a represented party who was in jail without first contacting and receiving the consent of his lawyer. Additionally, the facts, evidence, and law will prove that the forfeiture paperwork was defective and was only used as a pretext to initiate a face-to-face meeting with Richard Buswell to conduct a recorded interview.

On April 5, 2011, the government carried out its subterfuge and conducted a three hour and forty-five minute (3:45) interrogation of Richard Buswell. On April 18, 2012, the government filed a motion to disqualify Stanford as Richard Buswell's lawyer alleging a conflict of interest. On April 24, 2012, the government approached and interrogated Richard Buswell a second time. This

interview was not recorded.  On May 14, 2012, a hearing was held on the government's motion to evaluate conflict of interest.  Agent Donald DeSalvo (hereinafter "Agent DeSalvo") was the only government witness.  The government did not tell Stanford that they had a recorded interview of his client, Richard Buswell.  On May 18, 2012, Richard Buswell, Boyd Barrow, and Joshua Espinoza were indicted in the instant case.  In June 2012, Stanford was disqualified as Richard Buswell's lawyer in the federal securities case.  In July 2012, Stanford learned of the jail house recording and received a copy of the April 5, 2012, secretly recorded interrogation of Richard Buswell.  Stanford appealed his disqualification based on the April 5, 2012 recorded interview.  On August 20, 2012, the District Court ordered a rehearing on Stanford's disqualification.  On September 4, 2012, Stanford was indicted.

Stanford filed a motion to dismiss superceding indictment for prosecutorial/governmental misconduct and requested an evidentiary hearing on the motion.[13]  On April 26 and May 2, 1013, the Court conducted hearings on Stanford's motion to dismiss.  Stanford issued subpoena's to Assistant District Attorney, Alan Haney (hereinafter "ADA Haney"), DEA Task Force Agent William White (hereinafter "Agent White"), and Agent DeSalvo.  ADA Haney and Agent White testified on April 26, 2013.  Agent DeSalvo testified on May 2, 2013.[14]

### II.    Facts, evidence, law, and argument showing government misconduct

#### 1.    December 8, 2011, search and arrest warrants

Sometime in October and/or November 2011, Lafayette Metro Narcotics (hereinafter

---

[13]    Document 313 and 313-1, memorandum in support with exhibits.

[14]    ADA Haney testified on April 26 2013, Transcript pgs 8-49.  Agent White testified on April 26, 2013, Transcript pgs 50-125 (hereinafter "April TR").  Agent DeSalvo testified on May 2, 2013, Transcript pgs 8-218 (hereinafter "May TR").

"Metro") agents made "undercover" over-the-counter retail purchases of a Mr. Miyagi product after first presenting valid identification to prove that the purchaser of the product was eighteen (18) years old or older.[15] The products were sent to the Acadiana Crime Lab and tested positive for the presence of AM-2201.   On December 8, 2011, Lafayette Metro Narcotics conducted search warrants on Curious Goods, LLC, Curious Goods franchise stores,[16] Richard Buswell's residence and also executed arrest warrants.   The state seized for forfeiture the sum of $19,695.00 in a Midsouth bank deposit bag at Richard Buswell's residence.[17]   Also seized for forfeiture on December 8, 2011, was $14,200.00, $3,507.70, $776.00 in U.S. currency and $2,264.12 from a bank account.[18]   The $14,200.00 in U.S. currency was also seized at Richard Buswell's residence.   The $3,507.70 in U.S. currency was seized at the Curious Goods store on Evangeline Thruway and $776.00 in U.S. currency was seized from Curious Goods on Kaliste Saloom.   The $2,264.12 was money seized in account number 1273681, at the Rayne State Bank, a personal account belonging to Richard Buswell.

On December 8, 2011, numerous Curious Goods LLC employees were arrested as well as franchise owners and their employees.   Richard Buswell was also arrested that day at Stanford's law office.   Stanford advised arresting agents that he represented Richard Buswell on the state arrest

---

[15]      Conflicts Transcript pg 102.   Curious Goods requires proof via valid identification proving that a customer is eighteen (18) years old or older to purchase any product at Curious Goods).

[16]      Curious Goods LLC is a legal entity that exists separate and apart from Curious Goods franchise stores.

[17]      Testimony of ADA Haney, April 26, 2013, Misconduct hearing pg 31 (hereinafter, April TR pg 31).

[18]      Exhibit S-3, in globo, and S-6.

warrant.  Richard Buswell is the only individual arrested on December 8, 2011 who was not interrogated by law enforcement agents.

### 2.      The government

The term "government" is a generic term that is used to describe the lead prosecuting agency of a criminal case.  The United States Attorney's office for the Western District of Louisiana (hereinafter "U.S. Attorney") is the lead prosecuting agency in this case.    Although the U.S. Attorney is the lead prosecuting agency, there are numerous federal and state law enforcement agencies who are also involved in this prosecution.  Therefore, all evidence and information generated in this multi-state, multi-law enforcement investigation are considered to be within the possession and control of the government i.e., the U.S. Attorney's office for the Western District of Louisiana.

### 3.      DEA's joint involvement with Lafayette Metro Narcotics in the Curious Goods investigation

On December 8, 2011, Agent White's primary responsibility was to conduct recorded interrogations of all individuals either arrested and/or detained.[19]  Everyone arrested or detained was interrogated except Richard Buswell.[20]   Stanford told Metro Narcotics Agent Karry Falcon not to interrogate Richard Buswell because Stanford was representing him.

"Certainly in the beginning of this investigation we were conducting a joint investigation

---

[19]      Agent White's testimony on December 12, 2011, case 11-CR-00198, Transcript pg 34.  April TR pgs 52, 53, and 54.

[20]      May TR pg 107.

with metro narcotics."[21]  "Yes, ma'am.  Metro Narcotics and ourselves had a joint investigation, and

we were looking for assets, drug proceeds from the Curious Goods operation."[22]  Agent DeSalvo was

the DEA "supervisor of the investigation."  In January 2012, Agent White transferred from Metro

Narcotics to the DEA Task Force where Agent DeSalvo made him the case agent.[23]  In January 2012,

Agent DeSalvo and Agent White conducted numerous interviews of witnesses, co-defendants, and

unindicted co-defendants.  Agent DeSalvo and Agent White concluded that they wanted to

interrogate Richard Buswell and wanted to interrogate him without his lawyer being present.  The

government was monitoring every single call Richard Buswell made from the jail and also knew that

Stanford was representing Richard Buswell on his state drug arrest and property seizures.  Stanford

was a target of the DEA's investigation i.e., Stanford was a target of Agent DeSalvo.  However, the

government's investigation had not generated any substantive evidence and/or information showing

any wrongdoing by Stanford.  The evidence and/or information showed that Stanford was acting as

a criminal defense lawyer.  The agents believed that Richard Buswell would be able to provide

substantial evidence and information that would implicate Stanford in wrongdoing.

The agents were fixated on the idea of interrogating Richard Buswell without his lawyer

being present.  The agents believed  that Paul Buswell would be the most approachable and most

effective individual to "put it in his ear" i.e., present the idea of Richard Buswell talking to the

agents.  The agents turned their attention to Paul Buswell and launch their scheme.

---

[21]     Testimony of Agent DeSalvo, May 2, 2013, Misconduct hearing pg 99
(hereinafter "May TR pg 99).

[22]     Testimony of Agent DeSalvo, May 14, 2012, Conflicts Transcript pg 26.

[23]     May TR pg 8.

### 4.     Paul Buswell

Agent White [24] and Agent DeSalvo had numerous telephone and in person conversations with Paul Buswell.  Some, but not all of the conversations between the agents and Paul Buswell were recorded.[25]  Agent DeSalvo testified that "[w]e had obviously spoken to Paul Buswell and built a rapport . . ."[26]  The agents wanted to build a "rapport" with Paul Buswell and use him to reach out to Richard Buswell  while they listened in on the calls.

On February 15, 2012, the government interviewed Paul Buswell and recorded the conversation without his knowledge.  Agent DeSalvo could not remember who recorded the conversation, Agent White or Agent Shanahan.  "It could have been both.  Many times each of them will have their recorder . . ."[27] At that meeting, the government asked Paul Buswell to talk to Richard Buswell and to specifically raise the subject of Richard Buswell talking to the agents without a lawyer.  The government was monitoring  all of Richard Buswell's jail calls and would know when Paul Buswell had talked to Richard Buswell.[28]  The jail calls also informed the agents that Stanford

---

[24]     April TR pgs 61, 64, 65, and 77.  Stanford did not question Agent White about the recorded interviews and telephone calls of Paul Buswell.  On April 22, 2013, the government disclosed additional discovery to the defendants.  On April 24, 2013, Stanford received the discovery.  The February 15, 2012 interview was included but not the February 16, 2012 interview.  Stanford did not have the opportunity to review the February 15, 2012 interview prior to the April 26, 2013 hearing.

[25]     May TR pg 13, 101, and 105.

[26]     May TR pg 126.

[27]     May TR pgs 99,

[28]     May TR pg115.

was representing Richard Buswell on the state drug charge arrest and property seizures.[29]   The government's plan was to listen to Richard Buswell's jail calls and decide when the time was right to approach him.

The recorded interview shows that the government first raised the subject of wanting to interview Richard Buswell without his lawyer being present.

| | |
|---|---|
| Will: | Let me ask you this, not saying that it is going to happen **but would Richard be willing to talk . . . about this?** *Emphasis added.* |
| Paul: | I would think so.  Really, we have nothing to hide.  What I am telling you is what happened. |
| Will: | **We would have to get some approvals . . . he has got representation.  I mean, clearly, he has some representation.  We would have to run it by the prosecutors if he would be willing to talk without his legal representation being there.  If you talk to him or talk to your Mom or whoever is talking to him,** I am sure that he is making phone calls from the jail.[30]  *Emphasis added.* |

* * * * * * * * * * * *

| | |
|---|---|
| Paul: | I am not saying that he would not be willing to help at all but could it help him at all? |
| DeSalvo: | I don't know. |
| 3rd Party: | It can't hurt him. |
| DeSalvo: | **There is going to be some issues because he has got representation and we have to get their okay and such.**  Let me ask you something, is it possible that Richard may not have told you everything, that he may have known that this is vague, that this is not going to be a problem? *Emphasis added.* |
| Paul: | I don't believe that he would put me in that situation.  I know we had |

---

[29]   May TR pg 115-116.  April TR pgs 57, 58, 61, and 62.

[30]   S-23 at pg 58.

a falling out but I don't believe that he would put me in that situation.

DeSalvo: **I just want to make sure**.  I have never met Richard.  I don't even know what he looks like.  I don't know anything about him.  I was not there . . .*Emphasis added.*

Paul: Honestly, I think that he would have more information than myself.

DeSalvo: **That is what I am saying** . . . .[31]  *Emphasis added.*

\* \* \* \* \* \* \* \* \* \* \* \*

Paul: I can try to talk to him if you feel, you know . . . .

Will: Just ask him.  I am not saying.  **Just put it in his ear that we . . . Obviously, we need to get approval** but I am interested in talking to him.  *Emphasis added.*

DeSalvo: And he will have the same standards, got to tell the truth.  **We would have to have both attorney's sign off on it, things like that.** *Emphasis added.*

Will: I don's see it happening in the next two weeks.  **Just put it in his ear**. *Emphasis added.*

Paul: Do you think that this is something that could possibly plea to help with him that because I know that he is enough crap with the other case.

Will: **What does he have to say?  This is the trick bag**.  You don't want to get locked into a statement and as the investigation continues, we find out you are lying?[32]  *Emphasis added.*

On May 14, 2012, Agent DeSalvo testified that Paul Buswell approached him about Richard Buswell wanting to be interviewed by the government.[33]  The government's recording proves that

---

[31]     S-23, pg 59.

[32]     S-23, pg 60.

[33]     Conflicts hearing Transcript, pg 76.

testimony to be false.  Agent White initiated the discussion concerning Richard Buswell talking to the agents. Both agents acknowledge the fact that Richard Buswell was  represented.  Agent White tells Paul Buswell that they "would have to run it by the prosecutors if he would be willing to talk without his legal representation being there."  Agent White is talking about the federal prosecutors. Agent DeSalvo follows up with "there is going to be some issues because he has got representation and we have to get their okay and such."  Agent DeSalvo is also referring to the federal prosecutors. Agent DeSalvo again raised the issue of getting the federal prosecutors approval when he stated that "[w]e would have to have both attorneys sign off on it, things like that."  Agent DeSalvo and Agent White are referring to Assistant United States Attorney's Collin Sims and Assistant United States Attorney Kelly Uebinger (hereinafter "AUSA Sims and AUSA Uebinger").  Agents DeSalvo and Agent White met with AUSA Sims and AUSA Uebinger at some point after February 15, 2012.  It is unclear if there was one or more meetings with the government prosecutors.

### 5.    Service of "forfeiture paperwork"

Agent White knew that Stanford represented Richard Buswell on the state drug case and property seizure.[34] ADA Haney testified that he directed Agent White to personally serve forfeiture paperwork on Richard Buswell "[i]t would have been maybe a day or two before April 5th.  I can't give you an exact date to be honest with you."[35]   Agent White testified that he was first told about the forfeiture paperwork "around either mid March or late March" by Captain Ted Vincent and ADA Haney.[36]  Agent White could not recall how he came to posses the forfeiture paperwork, who gave

---

[34]        May TR pgs 115-116.  April TR 58, 75, and 77.

[35]        April TR pg 15.

[36]        April TR 56-57.

it to him or when it was given to him.[37] Agent DeSalvo testified that Agent White told him about

serving the paperwork on Richard Buswell approximately one to two weeks before April 5, 2012.[38]

On May 14, 2012, Agent DeSalvo was asked why he went to the Iberia jail to interview

Richard Buswell knowing that he was represented. "Well, we didn't - - we went over there to serve

paperwork as it relates to forfeiture."[39]

> Well, spoke to, not me, but the agent, the agent that was in charge of
> the asset forfeiture, Will White.  Prior to this investigation starting he was
> with Metro Narcotics.  He's recently been assigned to DEA.
> So when he became part of DEA, I'm his supervisor.  He told me
> what he had to do, serve the paperwork, and he contacted the assistant district
> attorney, Alan Haney, and said who can I serve or who do you want me to
> serve.  Alan Haney told him, I only want you to serve Richard Buswell.  So
> he told me about that.  I said, Well, I'm going to go with you.  So I decided
> to go with him.[40]

Agent DeSalvo makes no mention of Captain Vincent.  Agent White testified that Agent

DeSalvo accompanied him on April 5, 2012:

> because I was so new to the task force and I guess this tricky situation **as far
> as Mr. Buswell being represented, you know, <u>and</u> the pending securities
> case**.  I think Mr. DeSalvo went with me to make sure that  - - because it was
> such a touchy situation, to make sure it was done properly.[41] *Emphasis added.*

Agent White makes a distinction between Richard Buswell being represented on the state drug arrest

and "the pending securities case."

---

[37]      April TR 60, 61, and 62.

[38]      May TR 120-121.

[39]      Conflicts hearing pg 45.

[40]      Conflicts hearing pg 46.

[41]      April TR pg 91.

14

Agent DeSalvo did not know anything about state forfeiture proceedings and decided to contact ADA Haney.

> Yes.  Initially Agent White told me what  Alan Haney directed him to do, and I'm not involved - - I had never been involved in the state forfeiture process. I didn't know that they actually did that.  As a federal agent, we don't - - we don't do things the same way they do them, so I was a little confused.  So basically what I wanted was to talk to Alan Haney and clarify what exactly he wanted - - what he wanted Will to do as a metro agent and so we called him.[42]

ADA Haney told Agent DeSalvo that:

> He said he wanted it done personally.  He said that - - I think he said based on his understanding of the process, the state forfeiture process, and for no issues to be raised later, he wanted it personally.  I asked him can we serve someone else and he said no.[43]

Agent DeSalvo told ADA Haney that Stanford or Barry Domingue could be served.[44]

> I asked Alan Haney - - we don't want  - - I don't want to have Will White go over there and serve paperwork.  I want to serve Barry Domingue or Dan Stanford.  Alan Haney told me no.  At that point I can't argue with him.[45]

On April 26, 2012, ADA Haney testified that he did not know and was not told that Stanford represented Richard Buswell.  ADA Haney testified that Stanford's name was not even mentioned.[46]

 Agent White believed that the pretext of serving forfeiture paperwork would create an opportunity to interview Richard Buswell.

---

[42]     May TR 124.

[43]     May TR pg 124.

[44]     May TR pgs 124-125.

[45]     May TR pgs 149-150.

[46]     April TR pgs 19, 20, and 40.

> Donald DeSalvo had issues as far as whether or not it could be done **and would this, I guess, be an opportunity or - - be an opportunity as far as if Richard were to approach us** and began talking, because listening to the phone conversations while Mr. Buswell was in jail, he mentioned several times that he wanted to speak specifically to me.  Donald DeSalvo then met with the U.S. Attorney's Office to discuss, you know, what Mr. Haney had stated, what he wanted done, **and could this be an opportunity** and how do we - - how do we conduct ourselves if Richard Buswell starts talking to us.[47]

Agent White is discussing whether or not the service pretext "could be done" and that it would be an opportunity "as far as if Richard were to approach us and began talking . . ."  The agents were going to be approaching Richard Buswell not visa versa.  Richard Buswell was in jail.

Agent DeSalvo testified that but for ADA Haney directing him to approach Richard Buswell he would not have done so.

> Without Alan Haney directing us to do that, I didn't want to go talk - - not necessarily want to, but I didn't seek to interview Mr. Buswell.
> When this happened, **I knew this would present a situation that I wasn't real comfortable with, that I needed to talk to the prosecutor**.  So I spoke to Haney and **then I talked to the U.S. Attorney as well and said this is the issue**.  He's telling us to serve him, not to serve Daniel Stanford, not to serve Barry Domingue. He may talk.  He may not talk.  We can go in there, throw the paperwork down and walk out, or if he wants to talk, what do we do in that situation?[48] *Emphasis added.*

Agent DeSalvo was asked why he didn't just "throw the paperwork down and walk out."

Agent DeSalvo stated:

> Yes.  That was my intention, but I knew there were other possibilities.[49]

The "forfeiture paperwork" pretext created opportunities and possibilities for the government. The

---

[47]       April TR pgs 75-76.

[48]       May TR pgs 125-126.

[49]       May TR pg 138.

16

government decided to use the opportunities and possibilities created by their scheme with the belief that the payoff would be worth the violations i.e., the ends justify the means.

### 6.      Case agent serves forfeiture paperwork

ADA Haney testified that he would "always ask the case agent to go and serve the paperwork."[50]  ADA Haney knew that Agent White was working with Agent DeSalvo and it "had become obvious that the federal government was heavily involved in it."[51]  Agent White testified that Agent Ryan Shanahan (hereinafter "Agent Shanahan") was the case agent for the Curious Goods case.[52]  Agent DeSalvo was shown state affidavits that listed Agent Shanahan as the case agent.[53]  Agent Shanahan also served every forfeiture document in the Curious Goods case.[54]

Agent DeSalvo stated that part of the agreement with metro narcotics was:

> When White was determined to be the replacement, his captain told me the conditions of - - there were new conditions where he would be the replacement, on of which is Agent White will handle all the assets involved in this case.  He's been involved in it.  We want him to continue as a metro agent to continue with this process.  Like I said, it was divided.  Shanahan was a case agent, so was Will White. He was specifically geared toward assets.  And I agreed to it.[55]

However, Agent DeSalvo's testimony is not supported by the facts and the evidence in this case.  Lafayette Metro Narcotics affidavits and forfeiture documents unequivocally show that Agent

---

[50]      April TR pg 25.

[51]      April TR pg 27.

[52]      April TR pg 58.

[53]      May TR pgs 14-15.

[54]      May TR pgs 157-158 and Exhibit S-3.

[55]      May TR pg 122.

Shanahan was the case agent and that he was the agent who served every forfeiture document in the Curious Goods case.[56]

### 7.    The meeting with AUSA Sims and AUSA Uebinger

Sometime prior to April 5, 2012, Agent DeSalvo and Agent White met with federal prosecutors, AUSA Sims and AUSA Uebinger, to discuss the opportunities and possibilities that could arise from a face-to-face encounter with Richard Buswell i.e., to interview Richard Buswell regarding Curious Goods.

Agent White was asked about his meeting at the U.S. Attorney's office.  "I believe Don DeSalvo was with me, Collin Sims.  I want to say Ms. Kelly Uebinger.  That's all I can recall right now."[57]  Agent White stated that at that meeting:

> I wouldn't say I spoke that much.  I know Agent DeSalvo's position was Mr. Haney wants Will, who is now under my supervision, to serve Richard Buswell who is incarcerated.  Richard has stated on the phone that he wishes to talk to Will.  Will has to go serve this.  And I think it was mentioned that you need to protect yourself from Richard.  Then it was brought up possibly, you know, a recording device, but I know that Mr. Sims and also Mr. DeSalvo had stated that they would need to, I guess, notify their upper management I assume for direction or clearance or how - - maybe there was a conflict of some sort. I assume they did so.[58]

Agent White was asked if he had any further contact with the U.S. Attorney's office prior to going to the Iberia jail and stated:

> I guess to answer your question, I mean, once Don DeSalvo had talked to his legal department and Mr. Sims had talked to, I guess, his management, I was told that it

---

[56]    See, Exhibit S-3.

[57]    April TR pg 79.

[58]    April TR pg 80.

was going to happen.  I don't think we had any meetings before that.[59]

Agent White and Agent DeSalvo were directed to monitor Richard Buswell's jail calls and to initiate contact with Richard Buswell when the right opportunity presented itself.  The agents were also directed to use a concealed recording device and to record the interview of Richard Buswell. The government was confident that if the agents made contact with Richard Buswell he would talk. Agent White further stated:

> Not so much in those terms because the way Richard was talking on the phone, some interaction he was having with his family members, I think the decision was made that, you know, how do we address the issue if he comes and wants to talk to us.
>
> It was also mentioned that, you know, you need to record in order to protect yourselves from talk about the securities case or, you know, Richard making some oblivious complaint, I guess, to some degree, but when we went to Iberia, the purpose was to serve the forfeiture.  We were not going to - - it was pretty much a read and react on Richard as far as if he wanted to talk to us further, that we were there to serve the paperwork, but immediately upon arrival, you know, Richard indicates, you know, he's happy to see us, and he states, you know, I'm willing to tell y'all everything, but we tell him, no, not now.  We need to serve this paperwork, get this out of the way.  He continued to talk, making statements like, you know, you've earned the right for me to talk to you.  My brother and my mother like you.[60]

Prior to meeting with the federal prosecutors, Agent DeSalvo was aware that Paul Buswell had replaced Richard Buswell as an owner of Curious Goods and had replaced Barry Domingue as agent for service of process.[61]   Agent DeSalvo testified that he never looked at the forfeiture

---

[59]      April TR pg 82.

[60]      April TR pgs 82-83.

[61]      May TR pgs 117-118.  S-21 and S-22.

paperwork.[62]   Agent DeSalvo was asked if he knew whether the forfeiture paperwork was valid and

stated "I have absolutely no idea if it was valid or not."[63]   Agent DeSalvo met with AUSA Sims,

AUSA Uebinger, and Agent Greg Harbour (hereinafter "Agent Harbourt").[64]

> Without Alan Haney directing us to do that, I didn't want to go talk - - not necessarily
> want to, but I didn't seek to interview Mr. Buswell.
> **When this happened, I knew this would present a situation that I wasn't real
> comfortable with, that I needed to talk to the prosecutor**.  So I spoke to Haney
> and then I talked to the U.S. Attorney as well and said this is the issue.  **He's telling
> us to serve him, not to serve Daniel Stanford, not to serve Barry Domingue**.  **He
> may talk.  He may not talk.  We can go in there, throw the paperwork down and
> walk out, or if he wants to talk, what do we do in that situation?**[65]  *Emphasis
> added.*

Agent DeSalvo does not think he brought the forfeiture paperwork to the meeting but "[w]e

explained to them what it was. I don't even know if Will White had the documents at the time.  I

don't recall."[66] Agent DeSalvo explained that:

> Alan Haney wanted us to serve documents.  Personal service is what I knew.  I had
> never seen any of those documents before.  I don't recall seeing them before the day
> we served them.  I was accompanying Agent White because we were having issues
> with - - we were having issues with  - - we were having issues with metro narcotics
> at the time and I didn't want to go back and say we cant' handle this.  So I was
> looking, just out of ease, to initially serve you or Mr. Domingue.  We had
> conversations about it, but I wasn't familiar with the process.  **I didn't take the time
> to - - other than just talking to Mr. Haney, I didn't take the time to research it.**[67]

---

[62]      May TR pg 124.

[63]      May TR pg 149.

[64]      May TR pg 127.

[65]      May TR pgs 125-126.

[66]      May TR pg 128.

[67]      May TR pgs 128-129.

*Emphasis added.*

Agent DeSalvo testified that he did not want to record the interview but AUSA Sims and AUSA Uebinger directed him to record the interview "for our own protection and so I agreed." Agent DeSalvo did not remember if the federal prosecutors asked to review the forfeiture paperwork or serve the corporate agent.[68]   Agent DeSalvo was asked if the federal prosecutors gave him any advise on what to do if Richard Buswell brought up his lawyer.

> About his attorney?  Well, the first meeting, the meeting that we had, it wasn't settled there.  Mr. Sims conferred with, I think, management within the U.S. Attorney's Office.  So once that was decided , as far as his attorney, I don't recall honestly.  **I don't recall.**[69]  *Emphasis added.*

Agent DeSalvo was asked the same question again and stated:

> Right.  Well, again, to go back to it, once we dealt with the issue of the forfeiture paperwork, he mentioned Mr. Stanford.[70]

THE COURT:

> Let me interrupt.  This is a pretty straightforward question and it's one I'm very interested in, Agent DeSalvo.  He wants to know - - and if you don't remember, you don't remember  - - were yo given any advice by anyone from the U.S. Attorney's Office, any Assistant U.S. Attorney, as to what to say if Mr. Buswell mentioned his lawyer, and the only lawyer in the case at that time, whether the securities fraud case or the Curious Goods case at the state level, was Mr. Stanford.

THE WITNESS:

> Right.  **I think that was mentioned, any advice, is if he stated he wanted to speak to his attorney before he spoke to us regarding the interview, regarding speaking to him, was for us to end the interview**, but not necessarily in general if

---

[68]      May TR pg 134.

[69]      May TR pg 167.  Agent DeSalvo used the term " I don't recall" approximately 45 times on May 2, 2013.

[70]      May TR pg 168.

he brought up his lawyer in reference to the - -and I think I understand your question - - in reference to the forfeiture paperwork.  If he brought up his attorney there, **I don't recall getting advice.**[71] *Emphasis added.*

Agent DeSalvo testifies that if Richard Buswell brought up his lawyer before "an interview" he was "to end the interview."  How do you end an interview before an interview starts?  Was Agent DeSalvo advised that if and when Richard Buswell brought up his lawyer, he was to terminate his contact with Richard Buswell at that point?  So, Agent DeSalvo was first saying he received advise, then said he did not **recall getting any advise**.

The federal prosecutors knew that Richard Buswell was represented "whether the securities fraud case or the Curious Goods case at the state level" by Stanford.  First, AUSA Sims and AUSA Uebinger should not have authorized the agents to make contact with a represented individual who was in jail without first contacting and getting consent from his lawyer.  Even if ADA Haney wanted the federal agents to personally serve Richard Buswell with forfeiture paperwork, it does not matter.  The federal prosecutors should have shut down that operation once they were told about the scheme directly from the agents.  Instead, they directed the agents to record the interview.   The issue of whether federal prosecutors gave any advise regarding what to do once a known represented party mentioned his lawyer is a non-issue.  The agents should have never even been in direct contact with Richard Buswell.

### 8.    April 5, 2012

On April 5, 2012, Agent DeSalvo and Agent White drove to the Iberia Jail to conduct a recorded interview of Richard Buswell.  Agent White wore a recording device "[l]ike a lanyard" that

---

[71]    May TR pg 168.

was intended to resemble something other than a recording device.[72]  Agent White[73] and Agent DeSalvo[74] both testified that they went to the Iberia jail to serve the forfeiture paperwork.  The Agents called the Iberia jail before arriving and had Richard Buswell pulled out for them.[75]  Richard Buswell was brought into interview room where he first came into contact with Agent White and Agent DeSalvo.[76]  The agents did not read Richard Buswell his Miranda rights when they first came into contact with him.[77]

Agent White started by first explaining the seizure warrant to Richard Buswell.  Agent White explained that the money identified on the seizure warrant, $19,695.00, was the money of Curious Goods the business.  Agent White stated that the district attorney wanted Richard Buswell served personally.  Richard Buswell told the agents that other property had also been  seized and Agent White told him that "there is a lot of paperwork involved in the case."  Richard Buswell then stated "[w]ell, Dan is handling this now."   Agent White stated "[b]ut the district attorney wants you personally served."  Richard Buswell asked "[a]nd the reason for that?"  Agent White responded by saying "[w]hen I talked to your brother, he was initially very . . . . we don't need to go no further."  Richard Buswell said "[n]o, we do."  Agent White then said:

Hold on . . . but he wants to assure that because of that we don't want no errors, we

---

[72]     April TR 81.

[73]     April TR 84.

[74]     May TR 149.

[75]     May TR 144.

[76]     May TR 145.  April 5, 2012, Transcript pgs 1-9.

[77]     April TR 87.

don't want no misconception whatsoever.  We believe that this is the entities of Richard, serve him personally.

Richard Buswell responded with "[t]he entities of Richard?"  Agent White then said the money was Curious Goods money because it "was in a deposit bag with slips in it so he specifically said to serve you with it. Ok."  Agent White then shifted to the "rights of ownership for interest holders" document.  Agent White asked Richard Buswell to sign the document acknowledging personal service of the paperwork.  Richard Buswell said "[n]ot without my lawyer here.  I don't understand. I'm not trying to be . . . ."  Agent DeSalvo told Richard Buswell:

> This is basically . . . this is . . .Will was assigned this when he was working with Metro and now, he is working with us, so we are not involved in this at all but what I know from the past is that this starts the ball rolling on the proceedings in court.

Richard Buswell then said "Dan said that he was waiting for this so that we can get our things back." Agent White continues by telling Richard Buswell "[h]old on.  Read that and then, we will move forward."  Richard Buswell asks "[a]nd Dan will know what kind of laws this means huh?"  Richard Buswell also states "[o]k, this says that it has to be . . .like you are serving me?"  The agents continue with explaining and/or giving legal advise on the forfeiture paperwork.   Agent White mentioned Paul Buswell and Richard Buswell said **"Paul actually thinks very highly of you and I trust my brother with everything."**  Agent White again asks Richard Buswell if he wants to sign the paperwork and Richard Buswell said "I am going to let my attorney sign it.  I am uncomfortable with anything anymore.  Not with you . . ."  Agent White tells Richard Buswell that he will turn the paperwork in to the District Attorney's office and "he will be expecting something from your counsel."  Richard Buswell said "[w]hich is Dan."

The agents continued talking to Richard Buswell and discussed a separate federal investigation involving Curious Goods and get into issues involving Barry Domingue, Brady Becker, Boyd Barrow, and Josh Espinoza.  The agents tell Richard Buswell that they have been fair to everyone that they have talked to.  The agents discuss the fact that they have talked to Richard Buswell's mother and his brother.  Agent White tells Richard Buswell that he is aware that Richard Buswell has spoken with his brother and his mother and asks "[h]ave they given any inclination.." Richard Buswell responded with "[t]hey told me to talk to you."[78]

Agents presented the forfeiture paperwork to Richard Buswell and he refused to accept the paperwork or to sign anything without his lawyer and said so more than once.  The agents continued explaining the forfeiture paperwork and Richard Buswell continued telling them he had a lawyer and that he was not doing anything without his lawyer and that he felt uncomfortable with the situation. It was approximately fifteen to twenty minutes into the interview before the agents read Richard Buswell his Miranda Rights.  Agent DeSalvo was asked why he didn't just drop off the paperwork and leave when Richard Buswell said "Not without my lawyer here.  I don't understand.  I'm not trying to be . . ."  Agent DeSalvo testified that Richard Buswell was only refusing to sign the paperwork.  Agent DeSalvo was then asked why didn't he just write "refused" and leave the jail.[79] Agent DeSalvo testified that:

> **Because he was talking to us.  And that's what I had discussed with the U.S. Attorney's office, if he wanted to talk.  If I walked out of**

---

[78]     April 5, 2012, Transcript pgs 1-9.  April TR pgs 85-87.  May TR pgs 144-151 and 167-168.

[79]     May TR pg 148.

> **that - - if I walked out of that room right there - - again, this was an opportunity** to show that, hey, we're not bad guys.  We are not the big bad wolf.  That would have presented a very bad picture of the federal government.
>
> Again, we were laying - - if we had to lay groundwork for later on that he wanted to cooperate.  He was saying vile things on the phone about the government.  I wasn't going to be rude to him.  Honestly, that's the honest truth.  Whether he was going to talk or not, I honestly didn't know.  My guess was he was, but I couldn't make that decision.[80] *Emphasis added.*

Agent DeSalvo and Agent White both testified that they went to the Iberia Jail only to serve forfeiture paperwork on Richard Buswell.    If this were the true, the agents would have simply written "refused" on the paperwork and left the jail when Richard Buswell told them that his lawyer was handling the matter and "[n]ot without my lawyer here.  I don't understand.  I'm not trying to be . . ."  However, the agents followed the plan as discussed with the U.S. Attorney's office and continued talking to Richard Buswell about the forfeiture matter.

Agent White, while testifying about his April 24, 2012 contact with Richard Buswell, confirmed that on April 5, 2012, the government intended to conduct an interrogation of Richard Buswell.

> Correct, but the discussions that occurred between myself, Shanahan, and Richard were not in relation to any investigation.  **It wasn't like we went in there to ensue an interrogation.**  I had just spoken to Richard for almost four hours two weeks prior.  I wanted to go in there, have the documents served, answer any questions he would have, and then proceed out.[81] *Emphasis added.*

Agent White believed that the federal prosecutors were given a copy of the audio recording

---

[80]     May TR pgs 148-149.

[81]     April TR pg 109.

of Richard Buswell's interview soon after April 5, 2012.[82]  Agent DeSalvo testified that the federal

prosecutors were given a copy of the audio recording of Richard Buswell's interview within a couple

of weeks of April 5, 2012.[83]  Soon after the interview, Agent White created an 18 or 19 page

summary of the April 5, 2012, interview of Richard Buswell.[84]

### 9.      April 24, 2012

On April 24, 2012, Agent White went back to the Iberia Jail and conducted a second

interview of Richard Buswell.[85]  Agent White told Agent DeSalvo that he was going back to the

Iberia Jail to see Richard Buswell.  Agent DeSalvo did not go to the jail with Agent White.[86]  Agent

White testified that he was not directed by anyone and  "I took it upon myself to go serve Richard

Buswell personally."   Agent White made the decision to go on his own "because I'm following the

pattern of what's happened just, you know, 20 days or so days before where Alan Haney had directed

me to personally serve Richard Buswell."[87]  However, on this date, Agent Shanahan was the agent

who served the forfeiture paperwork as well as all other forfeiture paperwork.[88]

Agent White conducted a second interview of Richard Buswell and did not record the

---

[82]      April TR 88.

[83]      May TR 153.

[84]      April TR 108.

[85]      April TR pg 88.

[86]      May TR pg 154.

[87]      April TR pg 89-90.

[88]      April TR pg 91.  Exhibit S-3.

interview or prepare any document memorializing the interview.[89]  Agent White and Agent DeSalvo

knew that Richard Buswell was a represented individual and still made contact with him.

### 10.    May 14, 2012 hearing

Agent White believed that the federal prosecutors were given a copy of the audio recording

of Richard Buswell's interview soon after April 5, 2012.[90]  Agent DeSalvo testified that the federal

prosecutors were given a copy of the audio recording of Richard Buswell's interview within a couple

of weeks of April 5, 2012.[91]  Agent White created an 18 or 19 page summary of the April 5, 2012,

interview of Richard Buswell.[92]  Prior to the May 14, 2012 Garcia hearing, the government did not

disclose to Stanford that they had a recorded interview of his client.

On May 14, 2012, Agent DeSalvo was asked if a DEA-6 was generated and if notes of the

interview were maintained from the April 5, 2012 interview of Richard Buswell.  Agent DeSalvo

testified that a DEA-6 was generated and that the notes of the interview were maintained.[93]  On May

2, 2012, Agent DeSalvo testified that notes of the interview were not maintained because "I don't

think that was necessary.  It was recorded."   Agent DeSalvo was advised that the point of the

questions on May 14, 2012 was to determine if the agents had memorialized their interview with

Richard Buswell.   On May 2, 2013, Agent DeSalvo was asked point blank why he did not inform

Stanford or the Court at the Garcia hearing that the government had a three hour and forty-five

---

[89]      April TR pgs 91-97 and 108-109.

[90]      April TR pg 88.

[91]      May TR pg 153.

[92]      April TR pg 108.

[93]      Conflicts Transcript pg 96.

minute recording of the interview.  Agent DeSalvo stated:

> Well, you asked me if it was - - if it was - - if there was a DEA-6 generated
> and notes were maintained, but I never recall you asking me if it was
> recorded.

THE COURT:

> I'm going to ask you the specific question because it's bothered me from the
> moment I found out about this.
> Why, on the day of the Garcia hearing when that question was asked, wasn't
> Mr. Stanford told that the entirety of this meeting with Mr. Buswell was recorded?
> Can you answer that?

WITNESS:

> I can't.[94]

On May 2, 2013, Agent DeSalvo testified on direct that if Stanford had asked him directly,

at the Garcia hearing, whether Richard Buswell's April 5, 2012 interview was recorded he would

have testified "[t]hat it was recorded." Agent DeSalvo then testified that if that information had been

given to Stanford "[i]t would probably have hampered the investigation."[95]   However, Agent

DeSalvo testified that Stanford and others knew the DEA was involved in the investigation of

Curious Goods after Agent DeSalvo seized Richard Buswell's Mercedes in January 2012 and

interviewed Barry Domingue in January 2012.[96]  Moreover, on February 15, 2012, the government

interviewed Paul Buswell and secretly recorded the interview.  During the interview, Agent DeSalvo

was unequivocally telling Paul Buswell that the DEA was involved and the Curious Goods case

would be prosecuted federally.

---

[94]     May TR 152-153.

[95]     May TR pg 202.

[96]     Conflicts Transcript pg 112.

The current case? Oh, it will be prosecuted in federal court.  DEA will prosecute it. The U.S. Attorney will prosecute it and the state as well.  We have got the commitment.  And Barry, we told him, the U.S. Attorney, the one who prosecutes the case and me, the investigator says that it is getting prosecuted. . . . [97]

Agent DeSalvo was interviewing Paul Buswell and over forty (40) other witnesses about the Curious Goods case and telling everyone that the case and the Georgia people would be prosecuted in federal court.  If the government was trying to keep the fact that the Curious Goods case and the Georgia manufacturer and distributor were going to be prosecuted federally, they should have put duct tape over Agent DeSalvo's mouth.  By May 14, 2012, it was no secret that the DEA i.e., Agent DeSalvo was investigating anyone connected to Richard Buswell and/or Curious Goods and that the case was going to be prosecuted in federal court.  The government's withholding of the April 5, 2012, recorded conversation of Richard Buswell from his defense lawyer had nothing to do with compromising an ongoing investigation.

## 11.    The RCA

On May 2, 2013, the Court noted that there were two Retail Compliance Associations, the national one and the one incorporated as an LLC in Louisiana.[98]  The Louisiana RCA was incorporated as on November 28, 2011 as a nonprofit organization.[99]  The government stated in open court that the Retail Compliance Association is an organization and the government is not alleging that the organization itself committed anything illegal.  The government is alleging that Stanford

---

[97]    February 15, 2012, Transcript of Paul Buswell interview pgs 42.

[98]    May TR pg 66.

[99]    May TR pgs 77-78.

used the RCA to engage in illegal activities.[100]

Agent DeSalvo used the generic term "industry" interchangeably with the Mr. Miyagi product.  Agent DeSalvo's rational was if there were products that were harmful within the "industry" then the Mr. Miyagi product is itself harmful.  When Agent DeSalvo was pressed to give one single instance of the Mr. Miyagi product causing any type of harm or injuries, slight or otherwise, to anyone in Lafayette or Louisiana, he could not.  Agent DeSalvo testified that "I generally was speaking going the industry itself."  "Not necessarily Mr. Miyagi.  I didn't personally know of a individual that was smoking Mr. Miyagi that had those instances."[101]  It would be interesting to know what Agent DeSalvo told the Grand Jury regarding the harmful effects of the Mr. Miyagi product.

Agent DeSalvo testified that NutraGenomics began manufacturing, labeling, and packaging the Mr. Miyagi product sometime in April or May of 2010.  Agent DeSalvo testified that there was no evidence that Stanford:

1)      ever had any contact with NutraGenomics.

2)      had anything to do with the formulation of Mr. Miyagi.

3)      had any involvement in the manufacturing of Mr. Miyagi.

4)      had any involvement with the packaging of Mr. Miyagi.

If Stanford had no involvement in formulating, manufacturing, or packaging the Mr. Miyagi product, how could he then be part of a conspiracy to misbrand a product?  What did Agent DeSalvo testify to the Grand Jury regarding Stanford's involvement in misbranding.  What type of conjecture,

---

[100]      May TR pg 79.

[101]      May TR pg 19.

31

innuendo, and speculation did Agent DeSalvo present to the Grand Jury?

When Agent DeSalvo was asked about Stanford's involvement with the distribution of Mr. Miyagi he said "[a]t some point in time I think you were involved in part of that toward the tail end of this investigation."  Agent DeSalvo considered the "tail end" to be "[a]fter Mr. Buswell, Mr. Richard Buswell was jailed on the revocation hearing, you got involved."  Agent DeSalvo was asked specifically "after December 15th".  Agent DeSalvo said "[t]hat's correct. Well, before and after, but I know for a fact after you were involved in discussions as far as the marketing and sales."[102]

Agent DeSalvo was asked if the Mr. Miyagi product was ever sold by Curious Goods after December 8, 2011.  At first he said "I don't know if it was or not.  It may not have been."  Agent DeSalvo then said:

> Well, go back to your question.  It may not have been Mr. Miyagi.  It may have been the next produt that was going to be called - - that was going to be the new product for Curious Goods.  That's what I'm referring to as far as the marketing and sales.  Mr. Miyagi, I don't know.  I don't have that answer.  I'm sorry.[103]

Agent DeSalvo was again asked if Mr. Miyagi was ever sold at Curious Goods after December 8, 2011, and he said "I don't believe it was, but I don't know that for a fact."  Agent DeSalvo finally conceded that Curious Goods never sold any type of "potpourri" product like Mr. Miyagi after December 8, 2011, "[n]o.  They were trying to get a new product."[104]

Agent DeSalvo testified that because Stanford received checks from Richard Buswell and

---

[102]     May TR pgs 24-25.

[103]     May TR pg 25.

[104]     May TR pg 25-26.

drawn on Curious Goods[105] and one check from Boyd Barrow and drawn on Pinnacle Products[106] that had "RCA dues" written in the memo section of the check is itself evidence of criminal activity.[107] How did Agent DeSalvo testify to the Grand Jury regarding Stanford's receipt of some checks with "RCA dues" written in the memo section by the issuer?

Agent DeSalvo testified that "[a]fter November 28th there was a meeting held at Richard Buswell's home in which individuals were trained, I believe, based on the information we received, on how to sell the product without being arrested."[108]  Stanford specifically asked Agent DeSalvo to clarify if any "illegal" conduct occurred before November 28, 2011 or was Agent DeSalvo talking about the December 7, 2011 meeting.  Agent DeSalvo stated "[t]here were - - after December 8th."  Stanford specifically asked if any conduct occurred before November 28, 2011.  Agent DeSalvo said, "[y]es.  I think we charged that.  I think there were some RCA dues received."  Stanford again asked Agent DeSalvo about conduct "training, advising, instructing, that conduct."  Agent DeSalvo stated:

> Yes.  I believe that you were part of the organization that assisted these individuals and this is based on a number of interviews.  I don't have access to all of this information.  I formed an investigation - - or we formed an investigation based on more than one instance.  I stand by what we charged in the indictment.[109]

---

[105]     Stanford received a total of 9 checks from Richard Buswell and drawn on Curious Goods.  Three (3) of the nine (9) checks had "RCA dues" in the memo section.

[106]     Stanford received a total of three (3) checks from Boyd Barrow and drawn on Pinnacle Products.  One (1) of the three (3) checks had "RCA dues" written in the memo section.

[107]     May TR pgs 78-

[108]     May TR pg 80.

[109]     May TR pg 82.

Stanford asked Agent DeSalvo if the government possessed information consistent with what's charged in the indictment he said "I mean, it's based on what we plan to present in trial."[110]

Stanford specifically asked Agent DeSalvo if there was any "hard evidence" including documents that Stanford created that evidences the conduct alleged in paragraph H of the indictment.[111]  Agent DeSalvo first testified that there were documents.  Then reversed himself and said "[n]ot documents, but there's information that - - there's a document based on information you gave to the retailers."  Agent DeSalvo stated further "[t]here's a written document based on a recording that one of the retailers made of you giving information and advise to these retailers."[112] Agent DeSalvo stated that he was referring to a recording made in January 2012.

> In that recording you make reference to what you did in the past for these individuals, you speaking, hey, this is what we're doing moving forward, and then you go into describing what your duties were or what you were doing in the past for this organization.[113]

The January 2012 recording was an "audiotape of you meeting with Brady Becker, with Chris Quibodeaux, with Paul Buswell discussing getting the product on the shelves."  Stanford pointed out to Agent DeSalvo that:

> Didn't I tell them that if they were going to do that, that they should have it at least

---

[110]    *Id.*

[111]    Paragraph H alleges Stanford "trained, advised, and instructed the individual franchise owners of CURIOUS GOODS LLC and their employees, on how to store, display and sell the 'Mr. Miyagi' products, how to detect and evade law enforcement, and how to respond to customers who asked questions about how to use the 'Mr. Miyagi' products and/or the physiological effects of the 'Mr. Miyagi' products.

[112]    May TR pgs 83-84.

[113]    May TR pg 84.

tested by two labs, and prior to putting it back on the shelves, deliver the lab reports along with the samples to local law enforcement and have them independently test it before they even thought about putting it on the shelves?  Isn't that true?[114]

Agent DeSalvo responded with "[t]here were a lot of discussions."  Stanford then pressed Agent DeSalvo about the fact that he had made those statements at the January 2012 meeting.  Agent DeSalvo responded with "[y]ou may have said that."  Stanford also pointed out to Agent DeSalvo that he told Becker, Quibodeaux, and Paul Buswell that they should also bring the product and the lab reports to law enforcement for law enforcement to determine whether it is okay.  Agent DeSalvo responded with "Yes."[115]

On February 15, 2012, Paul Buswell met with Agent DeSalvo and brought lab reports for a new product he was considering selling.  Paul Buswell was getting legal advise from a lawyer in Baton Rouge.  Paul Buswell asked Agent DeSalvo to review the lab reports and give him an opinion.  Agent DeSalvo told Paul Buswell that he could not give him an opinion.[116]

Stanford specifically asked Agent DeSalvo if at the December 7, 2011, meeting whether Stanford had specifically trained or advised anyone at the meeting or tell anyone how to detect and evade law enforcement.  Agent DeSalvo testified that "Dan Francis did."[117]   What did Agent DeSalvo testify to the Grand Jury regarding the December 7, 2011, meeting and Stanford's role at that meeting?

---

[114]    May TR pg 215.

[115]    May TR pgs 215-216.

[116]    May TR pgs 39, 40, 49 and 52.

[117]    *Id.*

### 12.      Stanford received $80,000.00 from an unindicted coconspirator

The government alleges in count 1, overt acts, paragraph H, that on or about December 8, 2011, an unindicted coconspirator gave Stanford approximately $80,000.00 in U.S. currency.  The government is alleging that Paul Buswell gave Stanford $80,000.00 in cash that was used for bail and legal fees.  On February 15, 2012, Paul Buswell told Agent DeSalvo that "I gave money to help for bail and everything else and for the retainer."[118]  On February 16, 2012, Paul Buswell told Agent DeSalvo that "Yeah, I had actually, ah, given the money to Barry and he, passed it, to, so . . ."[119]  Paul Buswell submitted an affidavit attesting to the fact that he never gave any money to Stanford.

Agent DeSalvo testified on direct that "my impression was he gave it to Mr. Stanford and then I think he clarified that he handed it over to - - he said he handed it over to Barry Domingue first, but he made it clear tht Mr. Stanford was the recipient."[120]  Agent DeSalvo also testified "[w]ell, he passed money to Domingue who then passed it to Stanford is my understanding."[121]

On May 2, 2013, Agent DeSalvo was directed back to his testimony on May 14, 2012, at the Garcia hearing.  At the Garcia hearing Agent DeSalvo testified that:

So Paul Buswell made a statement that he had some money, and I believe his wife retrieved that money, returned back to the office, and Mr. Buswell said that he didn't know what to do with it.  It was a large sum of cash.  On person told me a hundred thousand dollars.  Paul told me 80,000, and he said that he asked what could he do with it, and Mr. Stanford said, I can put it in my trust account and keep it safe, and according to Mr. Buswell, he handed it over.[122]

---

[118]      February 15, 2012, Transcript of Paul Buswell at pg 35.

[119]      Government's Exhibit of Paul Buswell's interview on February 16, 2012, pg 5.

[120]      May TR pgs 191-192.

[121]      May TR pg 207.

[122]      Conflicts Transcript, May 14, 2012, pg 27.  May TR pgs 208-209.

The recorded interviews with Paul Buswell on February 15 and 16, 2012 clearly show that Paul

Buswell never made that statement to Agent DeSalvo.  When that was pointed out to Agent DeSalvo,

he sated "[a]nd I didn't say he did . . ." Agent DeSalvo then tried to alter what he had said on May

14, 2012.  Agent DeSalvo tried to change it from "Paul Buswell made a statement" and "Mr. Buswell

said" and "Paul told me" and "according to Mr. Buswell" to:

> So Paul Buswell made a statement  - - I'm not saying Paul made that statement.  I'm
> stating that - - **the story I'm telling** is from a number of people, that he had some
> money and he asked his wife to retrieve the money.[123]  *Emphasis added.*
>
> * * * * * * * * * * * * *
>
> No.  What I said here, my testimony here, is from a number of people.  I clarified a
> few things that Paul stated.  No one came back and asked me to clarify.  I wasn't - -
> **I was telling a story** from what the question was, "And did you speak to various
> individuals who were present at the meeting?"  "Yes, a few of them."  "To your
> knowledge." My knowledge, **I told the story**.  Should I have clarified what each and
> every person told me?  I wasn't asked.  I don't think I was even asked any question
> by you, Mr. Stanford, in this regard, and you could have easily said who said what.
> I was never asked.  I don't think the subject was broached by you.[124] *Emphasis added.*

Q.     Well, this is on direct examination with Ms. Uebinger.

A.     And I'm saying after the fact it was not - - I was not asked to clarify anything.

Q.     Well, that's not what's on the table.  What is is what you said.

A.     **And I'm saying I told a story.**[125] *Emphasis added.*

Agent DeSalvo finally admitted that he was telling stories.  Most of Agent DeSalvo's

testimony in this case, especially as it relates to Stanford, is a story.  Agent DeSalvo took conjecture

---

[123]     May TR pgs 209-210.

[124]     May TR pg 210-211.

[125]     May TR pg 211.

and stacked it on top of more conjecture to create hyperbole and manufactured a story he now calls his testimony.   What story did Agent DeSalvo tell the Grand Jury?

### 13.   ADA Haney

There is no way that an assistant district attorney would give a case agent and/or a federal agent defective documents for personal service.  In this case, the government is claiming that ADA Haney gave a "seizure warrant" that does not require service and a "rights of owner/interest holder" document that has no legal significance and also does not require service to Agent White to personally serve on a represented party.

ADA Haney handled asset forfeiture work for the Lafayette Parish District Attorney's office for approximately one to two years prior to December 2011.[126]   ADA Haney gave Agent White forfeiture paperwork to personally serve on Richard Buswell.  The forfeiture paperwork that ADA Haney gave Agent White was a "Seizure Warrant"[127] that listed $19,695.00 as property seized for forfeiture, that was signed by a judge on December 16, 2011 and a two page "Rights of Owner/Interest Holder"[128] document.  The "Rights of Owner/Interest Holder" document  did not contain the name of the owner,  description of the property being seized, date and place of the property seizure, the name of the seizing agency, and a summary of the conduct and/or offense giving rise to the property being seizured for forfeiture.  ADA Haney directed Agent White to personally serve these documents on Richard Buswell  "maybe a day or two before April 5th.  I can't give you

---

[126]     April TR pg 35.

[127]     S-5.  Seizure Warrant.

[128]     S-5.  Rights of Owner/Interest Holder.

the exact date to be honest with you."[129]

Pursuant to Title 26, Louisiana Revised Statutes 40:2606 (A),[130] when property is seized for forfeiture, the seizing agency has seventy-two (72) hours from the date of seizure to present a "Warrant of Seizure " to a Judge for signature to hold the property pending forfeiture.  LA R.S. 40:2608(1)(a)[131] mandates that when property is seized for forfeiture the district attorney shall serve Notice of Pending Forfeiture within one hundred twenty (120) days after seizure of the property. Service of Notice of Pending Forfeiture is covered under § 2608 (3)(a) and (4).  § 2608(3)(a) reads:

> (3) Whenever Notice of Pending Forfeiture or service of an in rem petition is required under the provisions of this Chapter, notice or service shall be given in accordance with one of the following:
>
> (a) If the owner's or interest holder's name and current address are known, by either personal service **or by mailing a copy of the notice by certified mail to that address**. *Emphasis added.*

---

[129]      April TR pgs 15-16 and 20.

[130]      LA R.S. 40:2606. Seizure of property. "(A).  Property that is **not evidence** of a criminal violation may be seized for forfeiture by any law enforcement agency designated by the district attorney, with or without process issued by any district court, on probable cause to believe that the property is subject to forfeiture under this Chapter.  Within seventy-two hours, exclusive of holidays or weekends, after actual or constructive seizure, the seizing agency **shall apply to the court for a warrant of seizure to hold the property pending forfeiture** . . ." *Emphasis added.*

[131]      LA R.S. 40:2608. Commencement of forfeiture proceedings; property release requirements.  Forfeiture proceedings shall be commenced as follows: (1)(a) When the district attorney intends to forfeit property, pursuant to the provisions of this Chapter, he shall provide the owner and interest holder with a written assertion within forty-five days after actual or constructive seizure, except in cases in which the property is held for evidentiary purposes, the district attorney shall institute forfeiture proceedings within forty-five days after the final disposition of all criminal proceedings associated with the conduct giving rise to forfeiture.  If the district attorney fails to initiate forfeiture proceedings against property seized for forfeiture by serving Notice of Pending Forfeiture within one hundred twenty days after its seizure for forfeiture . . . . the property shall be released from seizure for forfeiture on the request of an owner or interest holder, pending further proceedings pursuant to the provisions of this Chapter.

§ 2608(4) reads:

> (4) Notice is effective upon personal service, publication, or the mailing of a written notice, whichever is earlier, and **shall include a description of the property, the date and place of seizure, the conduct giving rise to forfeiture or the violation of law alleged, and a summary of the procedures and procedural rights applicable to the forfeiture action**. *Emphasis added.*

Notice should also include the name and address of the seizing agency and the district attorney to enable an owner or interest holder of the seized property to file a claim within thirty (30) days after service of Notice of Pending Forfeiture.[132]

Importantly, LA R.S. 40:2606, does not require that a "warrant of seizure" be served on the owner or interest holder of property seized for forfeiture.  Under LA R.S. 40:2606(A), there are only two (2) ways to obtain a warrant of seizure: 1) within seventy-two (72) hours of seizure of the property; or (2) within (72) hours after notice of pending forfeiture.   Under §2606 (A) the seizing agency **shall apply** for a warrant of seizure **within** seventy-two hours of either actual or constructive seizure exclusive of holidays or weekends; or under §2606 (C) the seizing agency **shall apply** for a warrant of seizure within seventy-two hours exclusive of holidays or weekends **after** service of notice of pending forfeiture.  Subsection (A) contemplates property that is seized for forfeiture and subsection (C) contemplates property seized as evidence.

In this case, $19,695.00, was seized for forfeiture on December 8, 2011,[133] and on December 16, 2011, the seizing agency applied to the court for a warrant of seizure pursuant to LA R.S.40:2606(A).   The state's "Seizure Warrant" reads in the first paragraph: "UPON FINDING the

---

[132]     LA R.S. 40:2610 (A).

[133]     S-3.

40

certified law enforcement officer to be a credible person, the facts stated establishing probable cause and the property described too be subject to forfeiture under the Laws of Louisiana therefore."  The second paragraph reads: "YOU ARE HEREBY **authorized and ordered to seize for forfeiture** and retain pursuant to LA R.S. 40:2607 the following: SEIZED PROPERTIES: U.S. CURRENCY: $19,695.00." *Emphasis added.*  As a matter of law, the $19,695.00 in U.S. currency seized on December 8, 2011, was seized for forfeiture.

The seizing agency failed to apply for a "Warrant of Seizure" within 72 hours, exclusive of holidays or weekends, of "actual or constructive seizure" of the $19,695.00 as mandated by the statute.  As a matter of law, the state's December 16, 2011 seizure warrant for the $19,695.00 was legally defective and did not have any legal effect on any pending forfeiture proceedings against the $19,695.00.  Why would ADA Haney give a legally defective seizure warrant to Agent White for personal service on a represented individual, Richard Buswell if: 1) the warrant of seizure does not have to be served on the owner or interest holder of property seized for forfeiture; and 2)the warrant of seizure is not legal notice to an owner or interest holder that the state is initiating forfeiture proceedings against property seized for forfeiture?[134]

When it was pointed out to ADA Haney that the seizure warrant was legally defective and did not require personal service ADA Haney testified, "[o]kay. Under circumstances where something is seized only for forfeiture, yes, that rule applies, but when something is seized and held as evidence, the State is allowed to hold that evidence until the conclusion of that, and in fact 45 days after the conclusion of the criminal case, then we must file for a seizure warrant, so that's the

---

[134]        LA R.S. 40:2608 (4).

41

answer."[135]    ADA Haney did not misread or misunderstand the forfeiture statute or its procedural

requirements prior to April 2012.[136]   ADA Haney was also aware of the law regarding the forfeiture

statute and its procedures when he testified.  ADA Haney was attempting to misstate the forfeiture

statute and procedure as it applied to the facts of this case when it was pointed out to him that the

seizure warrant was: 1)  legally defective;  and 2) unnecessary to initiate forfeiture proceedings.

ADA Haney testified "that's where you're mistaken because you should have looked at (C)."

LA R.S. 40:2606 (C) applies to property seized for evidence where a warrant of seizure is obtained

after filing notice of pending forfeiture.[137]   ADA Haney's testimony on this point is factually and

legally incorrect and it is inconsistent with his own reason for allegedly wanting to personally serve

Richard Buswell "[a]ccording to the forfeiture statute, I have 120 days to serve the forfeiture

paperwork, to give notice of pending forfeiture to the property owner."[138]   Moreover, if the property

had been seized as evidence and was being held as evidence, the 120 day deadline would not apply

and the district attorney would instead have 45 days following the final disposition of the criminal

case to file a notice of pending forfeiture.[139]

According to ADA Haney the property had been seized for forfeiture and he had "120 days

---

[135]      April TR pgs 16-17.

[136]      April TR pgs 16, 17, 18, 19, 21, 22, 23, and 24.

[137]      April TR pg 18.  LA R.S. 40:2606 ( C) and 40:2608 (1)(a) discuss property seized
as evidence.  When the state seizes property as evidence of a criminal violation "the district
attorney shall institute forfeiture proceedings within forty-five days after the final disposition of
all criminal proceedings associated with the conduct giving rise to forfeiture."

[138]      April TR pg 16.

[139]      LA R.S. 40:2606 ( C).

to serve the forfeiture paperwork, to give notice of pending forfeiture to the property owner."[140] ADA Haney further emphasized this point an stated, "I mean, there could have been some seizure warrants that were signed, but you have to remember that I have 120 days to serve them.  So do you understand what I mean?  I'm running into a time problem in early April and that's why **that one** has to be served."[141] *Emphasis added.*   However, pursuant to LA R.S. 40:2608(1)(a), the 120 day time delays started to run against all of the aforementioned property seized for forfeiture on December 8, 2011, and not just the $19,695.00.  The 120 day deadline to serve notice of pending forfeiture on all of the seized property was April 6, 2012.

According to his testimony, ADA Haney's objective was to serve Richard Buswell with notice of pending forfeiture on the $19,695.00 in U.S. currency within the statutory 120 day time limit.[142]   If this were true, ADA Haney would have provided Agent White with a notice of pending forfeiture that satisfied the notice requirements of LA R.S. 40: 2608(4).[143]

ADA Haney testified that he reviewed the "Rights of Owner/Interest Holder" document to make sure that it was in proper form and would provide legal notice to Richard Buswell of pending forfeiture proceedings.[144]  ADA Haney testified:

---

[140]      April TR pgs 16, 21, 22, and 23.

[141]      April TR pg 42.

[142]      April TR pgs 15, 16, 21, 22, and 23.

[143]      LA R.S. 40:2608 (4) reads: "Notice is effective upon personal service, publication, or the mailing of a written notice, whichever is earlier, and **shall include a description of the property, the date and place of seizure, the conduct giving rise to forfeiture or the violation of law alleged**, and a summary of procedures and procedural rights applicable to the forfeiture action.

[144]      April TR pgs 20-22 and 36.

On April 5th the decision was made that we were going to serve Mr. Buswell. **I looked at the paperwork.**  There was a decision that because there was an ongoing criminal investigation - - in fact, there is still an ongoing criminal investigation - - that we were going to hold off on giving the affidavit, which is not required by law, until we absolutely had to.  **So I took that paperwork, I looked at it, and I took the parts that I thought would be satisfying the statute as being a notice of pending forfeiture**.  *Emphasis added.*

At some point later you're showing me a piece of paper, this piece of paper, which you've marked at State's Exhibit 6.  That paperwork is different because at some point we moved to different paperwork, and so that's why they're different, Mr. Stanford.  In early April, this is one of the only seizures that had been signed by a judge, therefore we're running into our 120 days, so that's  why that one is the only one that's been served.

**And so I looked at that paperwork**.  **I made an attempt to have that be proper notice**.  I'm here to tell you that at some point during April I realized that it was **missing that date.**  Okay?  So you're right.  In early April it was not proper notice, and that's why later in April when we switched to the new paperwork I redid it.[145]

ADA Haney's testimony is that he actually reviewed the "Rights of Owner/Interest Holder"

document and determined that it satisfied the requirements of proper legal notice under LA R.S.

40:2608(4).  After a cursory review of the "Rights of Owner/Interest Holder" document it is obvious

that the document does not satisfy the notice requirements of the statute.  Importantly, the "Rights

of Owner/Interest Holder" document references at two separate areas that a "Notice of Forfeiture"

is a necessary attachment to that document.

The first sentence of the first page of the "Rights of Owner/Interest Holder" document reads

in bold print:

FORFEITURE PROCEEDINGS UNDER LOUISIANA LAW HAVE BEGUN AGAINST PROPERTY IN WHICH YOU ARE BELIEVED TO HOLD AN INTEREST ALL AS **DESCRIBED ON THE NOTICE OF FORFEITURE ATTACHED**.  *Emphasis added.*

The second page at the top reads:

---

[145]     April TR pg 36.

A description of the property seized, its location and value is as detailed **on the notice of forfeiture attached**.  The conduct initiating forfeiture proceedings is described in the affidavit in the Notice of Forfeiture proceedings as well as the identity of the seizing agent, agency and their address.  *Emphasis added.*

Obviously, the "Rights of Owner/Interest Holder" document is missing more than just a date.

It is missing a "Notice of Forfeiture" as an attachment with the mandatory information required by

§2608(4).   It is just not believable, under any reasonable explanation, that ADA Haney would not

have noticed that the "Rights of Owner/Interest Holder" document is itself legally deficient and/or

that it requires an attached "Notice of Forfeiture."

ADA Haney attempted to explain why he did not serve any forfeiture paperwork for the other

assets seized for forfeiture on April 5, 2012.  ADA Haney testified that:

> [w]ell, the reason why - - I guess the better answer is that the reason why it was - - that only one was served on April 5th is because that's the only - - that's the only one that I had that had been - - **that I had an asset seizure warrant for**.  The rest of them, there was no asset seizure warrant.  There might have been state criminal warrants for evidence, but there was no asset seizure warrant.  That was the only one.  **Again, I'm coming down to my 120 days, so it has to be served**.[146]  *Emphasis added.*
>
> I mean, there could have been some seizure warrants that were signed, but you have to remember that I have 120 days to serve them.  So do you understand what I mean?  **I'm running into a time problem in early April and that's why that one has to be served.**  Do you understand what I mean by that?[147] *Emphasis added.*

First, a warrant for seizure does not require service.  Second, a warrant for seizure has nothing to do

with the 120 day time limit to serve notice of pending forfeiture.  Third, the 120 day time limit to

serve notice began tolling on December 8, 2011 for all of the assets seized for forfeiture i.e., the

---

[146]      April TR pgs 41-42.

[147]      April TR pg 42.

$19,695.00, $14,200.00, $3,507.00,  $776.00 in U.S. currency and the $2,264.12 in the Rayne State Bank account.[148]

At some point, ADA Haney realized that the "Rights of Owner/Interest Holder" was invalid because "it was missing that date" and "that's why later in April when we switched to the new paperwork I redid it."[149]   Agent White identified the "Rights of Owner/Interest Holder" document as "[t]his is something that we have to give them, you know, along with a description of what's being seized or in the process of being seized and also the rights of ownership.  We give those forms to them."  When Agent White was asked what was being seized on April 5, 2012, he testified that "[t]he paperwork indicates that $19,695."[150]  Agent White was referring to the "Seizure Warrant." Agent White was questioned about the "Seizure Warrant" and the "Rights of Owner/Interest Holder" document and said "[s]ir, the only thing I can testify to Mr. Stanford is this S-5 was in existence and was being utilized up until probably early 2012 until they went to this new forfeiture form."[151] Accordingly, all previous forfeiture proceedings initiated by a "Seizure Warrant" and a "Rights of Owner/Interest Holder"  by the district attorney were defective notices of pending forfeiture.

The facts, evidence, and the law show that ADA Haney never contacted Agent White and told him to personally serve Richard Buswell with the "Seizure Warrant" or the "Rights of Owner/Interest Holder" documents.  To believe ADA Haney's testimony one has to conclude that: 1) ADA Haney did not read or understand the legal requirements for  proper service of a notice of

---

[148]     Exhibit S-3 and Exhibit S-6.

[149]     April TR pg 36.

[150]     April TR pg 70.

[151]     April TR pg 73.

pending forfeiture; 2)  ADA Haney read the "Rights of Owner/Interest Holder" document and did not recognize that the document itself failed to comply with the legal requirements of a notice of pending forfeiture; and 3) ADA Haney read the "Rights of Owner/Interest Holder" document and completely overlooked the fact that the document states at two (2) separate places that a "Notice of Forfeiture" should be attached and that the "Notice of Forfeiture" was not attached.  Moreover, both ADA Haney and Agent White testified that the district attorney's office used defective forfeiture paperwork for service on owners/interest holders prior to April 2012.

On April 10, 2012, ADA Haney notarized the "Seizure Warrant."[152] Agent White testified that he did not know who circled "personal service" or who wrote "5th" or "April" or "2012" on the "Seizure Warrant."[153]   Agent Donald DeSalvo (hereinafter "Agent DeSalvo") testified that he did not write "5th, April, 2012" or circle "personal service" on the "Seizure Warrant" and that he did not know who did.[154]

Respectfully submitted,

/s/ Daniel James Stanford
DANIEL JAMES STANFORD, Pro Se
LA Bar Roll No. 22639
812 Johnston Street
Lafayette, Louisiana 70501
(337) 232-2272

---

[152]   S-5.

[153]   S-5. April TR pg 69.

[154]   May TR pg 136.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July8, 2013, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by by the court's electronic filing system.

*/s/ Daniel James Stanford*
DANIEL JAMES STANFORD